**PAREV PRODUCTS CO., Inc., v. I. ROKEACH & SONS, Inc.**

**No. 105.**

Circuit Court of Appeals, Second Circuit.

Dec. 24, 1941.

David Haar, of New York City, for plaintiff-appellant.

Morton L. Deitch, of New York City (Stroock & Stroock and Milton Socolof, all of New York City, and Jacob Aks, of Brooklyn, N. Y., on the brief), for defendant-appellee.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This appeal involves the question whether or not an injunction should issue to enforce an asserted implied negative covenant in a contract granting an exclusive license to use a secret formula for a food product. In the District Court the complaint was dismissed on the merits, D.C.E.D.N.Y., 36 F.Supp. 686, on the ground that the parties to the contract did not intend a negative covenant. Although the District Court may perhaps have emphasized "intent" more than is realistic as to matters concerning which the parties have not revealed their thinking processes, it is, of course, obvious that the terms of the contract and the status arising out of those terms are of paramount importance. We turn, therefore, at once to the facts of the case.

In 1924, plaintiff, Parev Products Co., Inc., entered into a contract with defendant, I. Rokeach & Sons, Inc. At that time, as can be reasonably inferred from some of the terms of the contract, plaintiff was not in the best of financial condition. So far as appears, its principal product of manufacture was Parev Schmaltz, a cooking oil

made from coconut oil in such a way as to be Kosher, that is, usable with meat and dairy products without violation of the Jewish dietary laws. Parev Schmaltz was then supposed to be manufactured by a secret formula made by plaintiff's president, Aaron Proser, and, as the contract warranted, known only to him, Solomon Proser, and Julius Proser, though at the time a patent had been applied for on the formula and process. Defendant, on the other hand, was a successful business house of long standing. It engaged in extensive merchandising of food and cleansing products, mostly to orthodox Jews. The purpose of the contract, so far as appears, was to enable plaintiff to get out of its difficulties and to provide defendant with a Kosher semisolid vegetable oil.

By the terms of the contract, defendant obtained the exclusive use of all the necessary secret formulae, etc., for a period of twenty-five years, with an option to renew for another twenty-five years. In return, plaintiff was to receive royalties on all sales of Parev Schmaltz. Defendant had several powers to terminate, however. It could terminate the contract at any time it found the formula not to have been secret. Up to two years after the date of the contract, it could terminate the contract without cause upon payment of $100; and after two years, upon payment of $500. If any patents were judicially declared invalid, the contract was to terminate automatically. In defending any patent actions, plaintiff was to bear the full cost if suits arose during the first two years; after that, costs were to be split.

Under the agreement, defendant was privileged to use Parev Schmaltz as it should "think fit for its use and benefit absolutely." This same privilege was restated in another part of the contract with a complete specification of what was included, such as labels, trademarks, good will, and so on. For its part, plaintiff agreed not to engage or aid in the manufacture or sale of any product "similar" to Parev Schmaltz or in any business incidental thereto during the life of the contract; moreover, it agreed to deliver the agreement of the three Prosers not to "engage or aid, either severally or collectively, directly or indirectly, in the manufacture, sale or distribution of any article that might be in competition with [defendant] in the sale, manufacture and distribution of Parev Schmaltz or of any sim-

ilar product." Defendant promised after termination or expiration of the contract "not to engage in, directly or indirectly, in [sic] the manufacture, sale or distribution of the product Parev Schmaltz, or any product of a similar nature." Defendant was privileged to discard the name Parev Schmaltz, however, and any name which was substituted would always remain defendant's property.[1]

It should be noted that the contract therefore contained at least three express negative covenants, none directly applicable to the case before the court, and that the one to be made by the Prosers as individuals is the more extensive in mode of expression at least.

Thereafter defendant immediately dropped the name Parev Schmaltz, adopted Nyafat in its stead, and commenced production. From the beginning, Nyafat was a success and during the fifteen-year period from 1924 to 1939, royalties of approximately $135,000 were paid over. In 1940, however, a disturbing factor entered the picture. Defendant began the distribution of Kea, a semisolid cooking oil made almost wholly from cottonseed oil. Although defendant does not manufacture Kea, it distributes it under its own label as a Kosher product to the same orthodox Jewish trade. Defendant, of course, has not paid any royalties to plaintiff on its sales of Kea. Plaintiff claims that, since the royalties on Nyafat are based on an absolute sum per ounce and since the price obtained by defendant has been falling, defendant has undertaken the sale of Kea to avoid its royalty obligation. Defendant, on the other hand, asserts that Crisco and Spry, widely selling cooking oils, were cutting into the Nyafat market. This was aggravated, defendant says, by a nationwide price war which occurred as soon as Spry went on the market. Consequently, it is urged, defendant had to obtain a new product "similar" to Spry and Crisco, and in the same price range.

In this action, plaintiff seeks an injunction against any further sales of Kea by defendant. The theory is that we should imply a negative covenant on the part of defendant not to compete with its own Nyafat, or in any other way to interfere with the sales of Nyafat. Defendant's argument is that no covenant should be implied beyond what it calls conduct on its

---

[1] For more detailed statement of the contract, see pages 688, 689, of 36 F.Supp.

part of a "tortious" nature, or, in the alternative, that any covenant would forbid only the sale of products of a "similar nature." Kea, it says, is not similar. One is made from coconut oil, one from cottonseed oil. One is yellow, one is white; one is neutral in flavor, the other has an onion flavor. Other, somewhat esoteric, differences can be spelled out.

Although the District Court placed considerable reliance on this argument, we do not think that this should be finally conclusive. If any covenant is to be implied, it must be one which reaches the core of this dispute, which is the claim that a directly competitive product is produced by defendant. Whatever reasons there are for imposing on defendant such a strict obligation are hardly vitiated by the difference in composition of the two products. They are used for exactly the same purpose—shortening; if any covenant is to be implied, it would be hollow unless it took note of this fact. Thus, it seems rather unlikely that had plaintiff undertaken the manufacture of Kea today a court would have been content to say, as against a suit by the defendant, that the products were not similar under plaintiff's express covenant not to distribute a similar shortening.

Should, therefore, a covenant be implied under all the present circumstances? When we turn to the precedents we are met at once with the confusion of statement whether a covenant can be implied only if it was clearly "intended" by the parties, or whether such a covenant can rest on principles of equity. Expressions can be found which insist on "intention," Brimmer v. Union Oil Co., 10 Cir., 81 F. 2d 437, 440, 105 A.L.R. 454, certiorari denied 298 U.S. 668, 56 S.Ct. 833, 80 L.Ed. 1391; which seem to combine both a requirement of "intention" and of "equity and justice," Macloon v. Vitagraph, Inc., 2 Cir., 30 F.2d 634, 636; and which by-pass "intention" and rely solely on equity. Dermott v. State, 99 N.Y. 101, 109, 1 N.E. 242; King v. Leighton, 100 N.Y. 386, 391, 3 N.E. 594; Genet v. Delaware & Hudson Canal Co., 136 N.Y. 593, 609, 32 N.E. 1078, 50 N.Y.St.Rep. 53, 19 L.R.A. 127; cf. Eustis

Mining Co. v. Beer, Sondheimer & Co., D. C.S.D.N.Y., 239 F. 976, 984; Hotchkiss v. National City Bank, D.C.S.D.N.Y., 200 F. 287, 293, affirmed 2 Cir., 201 F. 664; Id., 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115. One may perhaps conclude that in large measure this confusion arises out of the reluctance of courts to admit that they were to a considerable extent "remaking" a contract in situations where it seemed necessary and appropriate so to do. "Intention of the parties" is a good formula by which to square doctrine with result. That this is true has long been an open secret. See 3 Williston on Contracts, Rev.Ed.1936, § 825; Holmes, The Path of the Law, 10 Harv.L.Rev. 457, 466; Fuller, Legal Fictions, 25 Ill.L.Rev. 363, 369; Chafee, The Disorderly Conduct of Words, 41 Col.L. Rev. 381, 398.[2] Of course, where intent, though obscure, is nevertheless discernible, it must be followed; but a certain sophistication must be recognized—if we are to approach the matter frankly—where we are dealing with changed circumstances, fifteen years later, with respect to a contract which does not touch this exact point and which has at most only points of departure for more or less pressing analogies.

Here defendant has a strong point in stressing the various extensive grants to it of the contract, as well as the express negative covenants which do not touch the present case. Undoubtedly extensive freedom of action was intended it. And yet that could not have been wholly unlimited, as indeed, defendant properly concedes when it admits that at least tortious competition or destruction of the Nyafat market was not open to it. And we must consider that in the period of time since the making of the contract there have been various developments which present a situation not clearly, if at all, within the contemplation of the parties at the time. Here a status exists upon which each party should be entitled to rely. What we should seek is therefore that which will most nearly preserve the status created and developed by the parties.

If we thus emphasize the situation existing today, two facts stand out. Plaintiff

2 Cf. Chafee, loc. cit.: "My first suggestion is, that we should firmly resolve never to speak of the intention of a testator or other writer on a given point except after we have carefully convinced ourselves that that point was actually in his mind when he wrote the words in question. For example, we will never say 'He intended this result' when we merely think that if he had foreseen the present contingency (which he didn't) then he would have intended this result. That consideration may be helpful, but it is not his intention."

must clearly rely on defendant for any future benefit to be derived from its original formula; and defendant, if it is to continue to remain in the vegetable oil market, must be able to prevent the inroads of outside products, such as Crisco and Spry. So far as the plaintiff is concerned, it has long since lost its hold on its own formula. Nyafat is known to the public as a Rokeach product. Even were the defendant to release the formula, plaintiff would have some difficulty. This is not the controlling factor, for if it were, defendant might very well terminate the contract. Instead, the sales of Nyafat continue. And yet if no covenant is found, defendant to some extent can let Nyafat slip in sales, while Kea is boosted. In other words, if the defendant does not terminate the contract, it can keep Nyafat under its control until Kea is successfully built up, and then it can safely forget Nyafat. The advantage is all to defendant. But a court of equity should grant some protection to a person who parts with his formula for exploitation. Thus, a court would hardly have permitted the defendant from the inception of this contract to lock up the plaintiff's formula in a vault and freely market Kea. There is no reason to do so now.

But defendant has an equally justifiable complaint to make. Kea, it asserts, is marketed only to compete with other products; and no attempt is made to injure Nyafat's market. Certainly we cannot say that defendant must market Nyafat, come what may, down to the sale of a mere can a year, while the vegetable oil business goes to outsiders. That would as violently alter the status of the parties as would a decree of complete freedom to defendant. It is thus clear that a strict injunction against any marketing of Kea is unjustified. Yet a complete denial of relief to the plaintiff under any circumstances would not be fair either.

As we have previously suggested, defendant indirectly acknowledges the need for a middle ground when it argues that cases implying a negative covenant, Genet v. Delaware & Hudson Canal Co., supra, and Foster v. Callaghan & Co., D.C.S.D.N.Y., 248 F. 944, have as their rationale the requirement that the conduct enjoined be tortious. This, presumably, amounts to saying that so long as defendant acts in good faith in judging the extent to which Kea must be sold to meet the competition of Crisco and Spry, no cause of action lies. But this, it seems to us, is to state the rule too narrowly; a limited rule of good faith, valid so far as it goes, does not exhaust the possibilities. See Harper Bros. v. Klaw, D.C.S.D.N.Y., 232 F. 609. The really equitable solution is to permit defendant to sell Kea so long as it does not invade Nyafat's market if that point is susceptible of proof, as we think it is. Thus, assuming that defendant is correct in its assertions, Kea sells only to people who no longer buy Nyafat.[3] Hence, all the plaintiff is entitled to is the market Nyafat has created and will retain, regardless of outside competition.

An injunction to reach such a conclusion would be so vague as to be meaningless under present circumstances. Its practical effect would be to restrain defendant from any sales of Kea—which we have held to be unfair. Only by inserting "good faith" in the restraining order could defendant be protected; and this would be equivalent to the rule we have found too narrow. It follows, then, that on the present record plaintiff cannot obtain an injunction. A broad one would be unfair to defendant; a narrow one would be an empty gesture.

But plaintiff should not be denied the opportunity to show a loss of the Nyafat market as we have thus defined it. Plaintiff may be protected if it can be determined what sales of Kea represent loss to outside products, what sales represent loss to Nyafat. Expert appraisal of market conditions would, it seems to us, answer this.[4] If loss were established, the measure of damages would be the amount of royalties on the

---

[3] It is only fair to state that plaintiff produced two housewives who said they had discontinued the use of Nyafat because Kea was cheaper. These witnesses did not say, however, that they would not have switched to Spry or Crisco.

[4] Assume, for example, that sales of Nyafat dropped steadily from 1933 to 1936, then from 1936 to 1939 Nyafat held its own. And assume Kea was introduced in 1939. If from 1939 on, Nyafat still held its own, Kea was not injuring Nyafat. On the other hand, if Nyafat again declined while Kea went up, Kea would be invading Nyafat's own irreducible minimum market. To be sure, this is an oversimplified example, and many extraneous factors affecting marketing would have to be eliminated. This would be the task of expert witnesses.

displaced jars of Nyafat. On this record, the evidence is too fragmentary to be conclusive. Since an injunction was sought, the action was brought too soon to reflect the nature of the competition among the various cooking oils. If the plaintiff has further evidence of the inroads of Kea, it should be entitled to present it, either hereinafter in this case or in a later action.

Judgment affirmed, with costs to defendant and with leave to plaintiff either to move to reopen the action, or to bring a subsequent action, for relief not inconsistent with this opinion.