Charlotte GLASS, Executrix of the Estate of Max Glass, Deceased, and Richard Glass, Respondents-Plaintiffs,

v.

Helen MANCUSO, Administratrix of the Estate of Dan Mancuso, Deceased, Appellant-Defendant,

A. Glenn Sowders, Robert D. DeWitt, J. L. McHugh Co., Inc., and Altman-Singleton & Co., a Corporation, Defendants.

No. 53916.

Supreme Court of Missouri, Division No. 1.

July 14, 1969.

Modified on Court's Own Motion Sept. 8, 1969.

Motion to Modify, for Rehearing or to Transfer to Court En Banc Denied Sept. 8, 1969.

Arnold N. Shanberg, Rope, Shanberg & Rope, Kansas City, for respondents.

A. Glenn Sowders, Jr., Kansas City, for appellants.

FRANKLIN FERRISS, Special Judge.

This is an appeal from a declaratory judgment which adjudged that a written contract relating to the sale of a restaurant in Kansas City had not been fully executed on October 13, 1965, when a fire gutted the restaurant premises. The lower court held that the seller, the Estate of Dan Mancuso, still held title to the restaurant at the time of the loss and ordered the purchase price returned to the buyer. The Mancuso Estate appealed from this order.

On April 29, 1965, Dan Mancuso died and in due course his widow, Helen Mancuso, was appointed administratrix of his estate, the chief asset of which consisted of Mancuso's Gondola Restaurant, located for many years at 229 West 75th Street in Kansas City. The estate had many creditors and J. L. McHugh, an experienced realtor, was engaged by the administratrix to sell the restaurant as a going business. To keep the restaurant in business pending a sale, Dan Mancuso's son, Ronald, quit his job and took over the operation of the restaurant. Another restauranteur, Max Glass, contacted Mr. McHugh in response to an ad placed by Mr. McHugh, and the upshot was that Max Glass signed a printed realtor's form in which as "Buyer" he made "the following offer to purchase the business located at 229 West 75th Street known as Mancuso's Gondola Restaurant, for the sum of $28,500.00, payable as follows: $2,850.-00 at the signing of this contract, $25,650.-00 to be paid at the closing of the deal, the said business consisting of all fixtures and equipment. Possession on or before September 15, 1965 * * * The Sellers agree to deliver possession free and clear of all liens, judgments or encumbrances and of good title except chest of drawers, statue, pictures." The realtor, J. L. McHugh, signed the printed form to evidence having received "a deposit" of $2,850.00, and on August 16, 1965, Helen Mancuso, Administratrix, affixed her signature as the "Seller".

The trial court received parol testimony as to the meaning of the above-described contract. All witnesses testified that the contracting parties intended to buy and to sell a going business, and not a collection of fixtures and equipment. Most wit·nesses also testified that the parties understood that before consummating the sale the Buyer would have to secure a long term lease on the premises at 229 West 75th Street. In addition, according to the heavy weight of the testimony, both parties understood that the Buyer intended to sell liquor as well as food, just as Dan Mancuso had done, and hence would have to secure City and State liquor licenses before consummating the sale.

The sale contract itself made no reference to the Buyer's obtaining a lease on the premises or liquor licenses. Neither did it set any date for "closing the deal", although the provision for "possession on or before September 15, 1965" suggests that September 15, 1965, was the date when the parties intended to conclude the transaction. Glenn Sowders, attorney for the Seller (the Mancuso Estate), testified the closing was postponed from September 15 to October 1 at the Buyer's request. During this additional time Max Glass obtained a supplemental Lease Agreement by the terms of which (1) Helen Mancuso, as Administratrix of her husband's estate, assigned to Max Glass the interest of said estate as Lessee of the premises at 229 West 75th Street to September 30, 1968, and (2) the owner of said premises consented to said assignment and extended said lease for an additional seven years, with the monthly rent to be increased during said additional seven years by a percentage of the monthly gross sales of the restaurant. Sales of liquor had been averaging about 30% of gross sales, which explains why the supplemental Lease Agreement contained a proviso that it was "subject to and contingent upon Lessee obtaining a liquor license from the State of Missouri and the City of Kansas City, Missouri." Glenn Sowders, attorney for

Helen Mancuso, Administratrix, was aware of this proviso at the time the supplemental Lease Agreement was signed on September 20, 1965.

On September 21, 1965, Glenn Sowders wrote a letter to Robert DeWitt, the then attorney for the Buyer, Max Glass, itemizing all the documents that would be needed in order to obtain the required liquor licenses. With the help of this letter, Max Glass' son, Richard Glass, took responsibility for gathering together and submitting all the various documents required by the Kansas City and State of Missouri Liquor Control authorities. Richard Glass was actually going to operate the restaurant, so the applications for the licenses were in his name. This meant that he had to furnish a picture of himself and be fingerprinted. A picture of the building at 229 West 75th Street was also required. By October 1st Richard Glass had submitted to the Liquor Control authorities everything he was told that they required.

On October 1, 1965, Richard Glass persuaded Ronald Mancuso to turn over to him the keys to the premises so that he could get started on the remodeling of the premises. Ronald was somewhat reluctant to do this, as he knew the balance of the purchase price had not yet been paid, but Richard told him that if the sale fell through, the Glasses would restore the premises and even leave it in better shape than it was. On taking possession, Richard at once started cleaning and remodeling the premises. He also sent the owner a check for the October rent.

With the Buyer in possession of the restaurant, the Mancuso's lawyer, Glenn Sowders, became increasingly uneasy. Several times he phoned Richard Glass and Charles DeWitt, the attorney for Richard and Max Glass, about getting the balance of the purchase price paid. On October 7, 1965, he demanded that the balance be paid or all remodeling would have to cease. That same day Richard Glass delivered a check for the balance to DeWitt, who agreed to deposit the

check in a joint account with Sowders to be used to pay off claims against the Mancuso Estate. Also on October 7 Max Glass met with an insurance agent, Altman, and placed with his company, Altman—Singleton & Co., a verbal order for fire and extended coverage and business interruption insurance on the restaurant property.

The following day, October 8, Sowders presented DeWitt with a letter spelling out the terms on which the balance of the purchase price would be deposited in their joint names as trustees for their respective clients. DeWitt got his client, Max Glass' approval of this letter, signed the letter and gave Sowders his client's check for $25,650.00, representing the balance of the purchase price, which was deposited in a joint savings account from which withdrawals required signatures of both Sowders and DeWitt. At the same time, Sowders gave DeWitt a copy of a Probate Court Order approving the sale of the restaurant by Mrs. Mancuso as Administratrix and a bill of sale to the restaurant signed by Mrs. Mancuso.

The text of said letter is so imporant to the issues in the case that it is here quoted in full:

"A. GLENN SOWDERS, JR.
Attorney at Law
615 John Hancock Building
800 West Forty-Seventh Street
Kansas City, Missouri 64112

October 8, 1965

Mr. Robert D. DeWitt
450 Professional Building
1103 Grand Avenue
Kansas City, Missouri

Re: Richard's Steak House
Estate of Dan Mancuso

Dear Bob:

"This letter summarizes our agreement with reference to the purchase price for Mancuso's Gondola Restaurant, 229 West 75th Street, Kansas City, Missouri. Your

client, Mr. Max Glass and Mr. Richard C. Glass have agreed to pay $28,500 and have deposited $2,850 with Mr. J. L. McHugh as down payment. The balance thereof in the amount of $25,650 is being placed in an account in the name of "Estate of Dan Mancuso and Richard's Steak House" with authorized signatories by yourself and me as trustees. This is to be a savings account in Empire State Bank, and it is agreed that the interest earned on this savings account shall become the sole property of the Estate of Dan Mancuso.

"You agree to release this account upon presentation to (sic) of a full and complete list of creditors who have filed claims against the Estate of Dan Mancuso within the six month period after the date of death of Dan Mancuso. This is for the reason that all claims filed within six months after the date of first publication of notice of granting of letters on the estate are preferred claims, and will be paid after funeral expenses, debts including taxes and judgments rendered against the estate.

"I hand you herewith an executed bill of sale and a certified copy of the court order authorizing sale of Mancuso's Gondola Restaurant to Max Glass and Richard C. Glass. By your signature hereon, you acknowledge receipt of these items.

"Upon deposit of the funds aforesaid, we agree to commence payment of all current bills incurred from and after the date of death of Dan Mancuso, and to do all things necessary to pay current claims. As I have indicated to you previously, Mrs. Mancuso is advancing monies to the estate in order that all the current bills may be paid. As soon as we have received verification of the amounts at September 30, 1965 (the close of business for Mancuso's Gondola Restaurant) I will furnish a complete list to you. In the meantime, enclosed is a list which is complete through September 15, 1965. This list indicates that the amount of taxes have not yet been determined, but I anticipate that these will be completed within the next four or five days.

"If this letter meets with your approval, will you so indicate on behalf of your clients, Max Glass and Richard C. Glass, by signing a copy hereof and returning it to me?

Very truly yours,
/s/ A. Glenn Sowders, Jr.

AGS :ms

"The foregoing meets with my approval and approval on behalf of my clients, Richard Glass and Max Glass.

/s/ Robert D. DeWitt
Robert D. DeWitt"

The trial court received parol evidence as to the meaning of this document also. When Richard Glass was asked (on cross-examination by Glenn Sowders) what his understanding was about what the two lawyers were to do with the money in the joint account, he testified that "as soon as we found out exactly how much was owed (by the Mancuso Estate) and that this money would cover all expenses and that all (the Estate's) creditors were satisfied, then we would let Bob (DeWitt) release the money to do whatever you wanted with it but not until then." Later, Richard was asked again what this money was to be held for and he replied, "mainly for those bills * * * and whether or not we were going to operate * * * our lease depended on our liquor license. Without our liquor license, we don't own a business." When asked whether he had any agreement to that effect with anyone, Richard testified, "I don't know—I know as far as writing there wasn't."

When Max Glass was asked (in the deposition taken before his death) what the reason for this "escrow arrangement" was, he testified that he had found out "that Mancuso's owed everybody in town a pretty good sum of money, and I didn't want to turn any money over to them until I knew that these bills had been paid."

He further testified that the negotiations for the lease on the premises were completed and the contingency of securing a lease was fulfilled at the time he authorized DeWitt to sign Sowders' letter and to hand over the check for $25,650.00. He further testified that the liquor license had not then been issued, but that he thought everything that had to be done was done and he was "quite sure" that that contingency also would be fulfilled, i. e., the liquor license would be issued.

Robert DeWitt, attorney representing Max Glass in the purchase of the restaurant, testified that although the above-quoted letter of Ocober 8, 1965, made no mention of the liquor license, he "felt that contingency was still uppermost in everybody's mind." He further testified that although said letter states that the balance of $25,650.00 is to be placed in a savings account and the interest earned thereon would belong solely to the Estate of Dan Mancuso, nevertheless "that statement was based upon the assumption that everything else was going to be completed according to the terms and contingencies in the supplemental Lease Agreement."

Following the signing of the above letter, Glenn Sowders deposited the $25,650.00 representing the balance of the purchase price in a joint savings account, where it is still drawing interest. The remodeling of the restaurant continued and by October 13, 1965, Richard and Max Glass had spent between $5,000.00 and $7,000.00 on fixing up the place, although it was still not ready to open for business, nor had the liquor licenses been issued.

On the night of October 13, 1965, there was an explosion and a fire on the premises at 229 West 75th Street, causing very extensive damage to the building and its contents. At the time of the loss the only fire insurance policy issued on the contents of the restaurant consisted of a $16,000.00 policy which the Mancuso family had been carrying on a monthly basis with Gulf Insurance Company. The last premium had been paid on September 25, 1965, and

this kept the policy in force until October 25, 1965. The insurance agent on this policy telephoned the Mancusos' lawyer, Sowders, the day after the fire to find out whether the sale of the restaurant had already taken place. Mr. Sowders told him that "the transaction had already occurred and that Gulf would now be off the hook." No claim of loss was ever presented to Gulf Insurance Company by the Mancuso estate. Sowders testified that the $16,000.00 policy had not been cancelled at the time that "title to the restaurant was transferred" because the policy had only until October 25, 1965, to run and the amount of the refund was so small. It was for the same reason, he said, that he advised the Buyer's attorney, DeWitt, on October 7, 1965, to apply for a new insurance policy rather than get an assignment of the $16,000.00 policy held by the Mancuso estate.

The morning after the fire Max Glass telephoned to Mr. Altman, the insurance agent to whom he had talked on October 7 about getting insurance on the restaurant, and Altman told him that his agency had not yet placed any insurance on the property, his position being that he had only agreed that he "would try and place" said insurance.

The central issue in Count II, which has yet to be tried, is whether Altman did so limit his agreement with Max Glass, or whether (as Max Glass maintained) he told Glass that he was "covered" then and there. Certain it is that at the time of the fire no binder nor policy of insurance of any kind had been issued that covered Max Glass' interest in the restaurant or its contents.

The next blow for Max and Richard Glass came about two weeks later when Roy K. Dietrich, attorney for the owner of the premises, wrote a letter to Arnold Shanberg, to whom the Glasses had turned for legal help. This letter pointed out that "the original lease papers (to Dan Mancuso) show that in case of a fire and destruction of more than one-third of the

premises, any lease of the premises could be terminated, and * * * the owner of the premises is not going to rebuild or restore the improvements on the property, and insofar as either Max Glass or Richard Glass, or both or either of them, might claim to have any interest as lessee, please be formally notified that the owner of the premises * * * elects to cancel any outstanding lease." The letter also returned the $700.00 check which the Glasses had paid the owner for the October rent of the premises and which had never been cashed.

Thus the Glasses, who had parted with the balance of the purchase price, $25,650.-00, on October 8, 1965, in order to be allowed to continue with their remodeling of the restaurant, found themselves on October 27, 1965, with the restaurant furniture and fixtures destroyed by fire, no policies of insurance yet issued and their lease cancelled by the fee owner. Thereupon the Glasses' new attorney, Arnold Shanberg, filed the present suit, seeking in the first count (1) a declaratory judgment as to who owned the restaurant property on the date of the fire, and if the court found the Mancuso Estate owned it, (2) the return to Max Glass of his "deposit" of $2,850.00 with the real estate agent handling the sale and the $25,650.00 paid to the two attorneys, Glenn Sowders and Robert DeWitt, as "trustees" under the signed agreement of October 8, 1965. In the event that the trial court found that on the date of the fire, Max and/or Richard Glass owned the restaurant, then in the second count said plaintiffs asked for a jury trial to decide whether plaintiffs were entitled to recover from Altman—Singleton & Company on Richard Altman's alleged oral agreement to bind fire and extended coverage insurance in and upon the restaurant in the sum of $35,000.00 and business interruption insurance up to $50.-00 per day.

During the trial of the first count, plaintiffs' position was that they were not the legal owners of the restaurant at the time of the fire inasmuch as the liquor licenses had not then been issued. This last fact was undeniably true, although between the date of the fire and the owner's cancellation of the lease the Kansas City liquor authorities did approve Richard Glass' application for a liquor license, and in normal course State approval would have followed in about four days. Neither license was ever actually issued since the owner availed himself of his right to cancel the lease because of the destruction by fire of more than one-third of the premises. In passing, we note that the letter of cancellation from the owner's attorney referred to Glass' failure to obtain a liquor permit as the reason for returning the $700.00 check for October rent. It is abundantly clear from the entire record, however, that the chain of causation was (1) the fire, (2) the owner's decision not to restore the premises, (3) the owner's cancellation of the lease, (4) the return of the $700.00 check, and (5) the non-issuance of liquor licenses due to the applicant's lease having been cancelled.

The trial court entered detailed findings of fact and conclusions of law, all of which support the judgment nisi which awarded to plaintiffs their original deposit of $2,850.00, the savings account of $25,650.00 and all interest earned on said account, together with court costs. The issues on appeal all depend on the validity of these findings and conclusions of the trial court, which are as follows:

"the Court finds as follows:

"1. That on or about the 16th day of August, 1965, the plaintiffs did enter into a contract with the defendant, Helen Mancuso, Administratrix of the Estate of Dan Mancuso, Deceased, for the purchase of a business located at 229 West 75th St., Kansas City, Missouri, known as Mancuso's Gondola Restaurant, for the sum of $28,500.00;

"2. That on or about August 16, 1965, the plaintiffs did deliver to the defendant, J. L. McHugh Co., Inc., the sum of $2,850.-

00 as a deposit in connection with the said contract, which sum was thereafter retained by the said defendant, J. L. McHugh Co., Inc.;

"3. That the said Mancuso's Gondola Restaurant was a going business at the time of said contract and was engaged in the sale of liquor by the drink and foods normally sold in a restaurant;

"4. That the sale aforesaid was for a going business and was thereby contingent upon the plaintiffs as buyers obtaining a long-term lease upon the premises and a license from the City of Kansas City, Missouri and the State of Missouri for the sale of liquor by the drink;

"5. That thereupon, on or about the 20th day of September, 1965, the plaintiffs did procure a supplemental lease agreement covering the premises for a term of ten years commencing on the first day of October, 1965 and terminating on the 30th day of September, 1975, which agreement was executed by the defendant. Helen Mancuso, Administratrix, and the said agreement was contingent upon Plaintiffs, as Lessee, obtaining a liquor license from the State of Missouri and from the City of Kansas City, Missouri, and did further provide that the said lease agreement would be null and void unless such licenses be obtained;

"6. That thereupon, on or about the 21st day of September, 1965, the said lease agreements were delivered to the owner of the said real property together with a check covering the rental for the month of October, which leases and check were retained by the said Lessor pending Plaintiffs' securing the liquor licenses as aforesaid;

"7. That thereupon, on or about October 8, 1965, the plaintiffs did go into possession of said storeroom for the purpose of renovating and remodeling the same, and did deposit the balance of the purchase price, to wit, $25,650.00 with the defendants, A. Glenn Sowders, Jr. and Robert DeWitt, as trustees, for the purpose of disbursing said funds to the creditors of the said seller upon consummation of the said sale;

"8. That at all times the possession delivered to plaintiffs was contingent upon the liquor license being secured and it was agreed between the parties that in the event the said license should not be issued, the premises would be returned to said seller and would be restored to their original condition or to such condition as would satisfy seller;

"9. That thereupon on October 13, 1965, the premises housing said business and the business itself were totally destroyed by fire and explosion from causes unknown;

"10. That at the time the premises were destroyed, to wit, October 13, 1965, no liquor licenses had been issued to the plaintiffs and said license from the City of Kansas City was not issued until October 20, 1965, and the license from the State of Missouri was never issued;

"11. That by reason of the destruction of the premises and the failure to secure the licenses aforesaid, the owner of the premises did declare the lease agreement of September 20, 1965, null and void and did return the check for the October rental to the plaintiffs;

"12. That the sum of $2,850.00 in (sic) still in the possession of the defendant, J. L. McHugh Co., Inc., and the sum of $25,650.00, together with interest thereon earned to date, is still in the possession of the defendants, A. Glenn Sowders, Jr. and Robert DeWitt, as trustees;

"That under the findings of fact as aforesaid and the law applicable thereto, the Court further finds as follows:

"1. That the jurisdiction of the Court was properly invoked under the provisions of the Declaratory Judgment Act of Missouri;

"2. That under the law and evidence, the contract in issue was for the sale of a going business, contingent upon the buyers

securing a lease and appropriate liquor licenses;

"3. That under the law and evidence, the contingencies aforesaid were not satisfied on October 13, 1965, the date the premises were destroyed;

"4. That at the time of said destruction, the premises were, and continued to be thereafter, the property of the defendant, Helen Mancuso, Administratrix of the Estate of Dan Mancuso, Deceased, and by reason of said destruction the contract could thereafter no longer be performed;

"5. That the plaintiffs are entitled to receive and recover the sum of $2,850.00 from the defendant, J. L. McHugh Co., Inc., and are further entitled to receive and recover the sum of $25,650.00, together with interest earned thereon to date, from the defendants, A. Glenn Sowders, Jr., and Robert DeWitt, Trustees."

The central issue is: Who owned the restaurant at the time of the fire on October 13, 1965; or had the sale of the restaurant to the plaintiffs been completed prior to October 13, 1965?

■ The defendant Seller (the Administratrix of the Mancuso Estate) argues that both the sale contract and the letter agreement of October 8, 1965, are complete and unambiguous documents and that the trial court erred in receiving parol evidence as to the meaning of these documents and in finding that there were any oral contingencies involved in the sale. The first response to this from the plaintiff Buyers (Richard and Max Glass) is that any such error was not preserved for appellate review, either at the time of trial or in the defendant Seller's motion for new trial, citing Supreme Court Rule 79.03, V.A.M.R. The Seller's attorney did, in fact, object a number of times to the trial court's receipt of parol evidence as to the meaning of these documents, but the defendant's motion for new trial made no express reference to error in the trial court's receipt of parol evidence. However, said motion for new trial did allege error in the trial court's findings, and said findings were necessarily based on a consideration by the trial court of parol evidence. If such evidence was inadmissible, this court must disregard it in passing on the trial court's findings, even if the parol evidence had been received without objection. Commerce Trust Co., v. Watts, 360 Mo. 971, 231 S.W.2d 817, 1. c. 820; 32 C.J.S. Evidence Section 617, p. 784.

We consider first the defendant Seller's claim that the sale contract was complete and unambiguous. The contract stated that the Buyer would "purchase the business located at 229 West 75th Street known as Mancuso's Gondola Restaurant * * * the said business consisting of all fixtures and equipment * * * except chest of drawers, statute, pictures." The word "business" by itself is ambiguous, 12 C.J.S., pp. 761, 762. Here the contract states that "the business" being sold consists "of all fixtures and equipment," except for certain designated items. But if only said fixtures and equipment were being sold, why did the parties use the word "business" as the subject matter of the sale? The use of that term as the subject matter of the sale suggests that the parties intended to buy and to sell a going business, but the language used leaves room for doubt. The description of the business as "located at 229 West 75th Street, known as Mancuso's Gondola Restaurant" could have been intended merely to identify where and under what name the property being sold could be found, but it could also have reflected the parties' understanding that the Buyer would carry on the same type of business at that location.

■ Our conclusion is that the sale contract was not complete or free from ambiguity, and hence that parol testimony was properly received by the trial court. Said testimony, summarized above, showed clearly that the Seller intended to sell and the Buyer intended to buy (1) a going business, (2) to be operated by the Buyer at

the same location, (3) under a lease to be negotiated with the owner of the premises, and (4) to sell at retail both food and liquor, as had been done by the Mancuso family.

The defendant Seller's brief points out that the Seller's witnesses "admitted that the plaintiffs must obtain a lease in order to operate on the premises and must obtain liquor licenses in order to sell liquor by the drink," but that "the plaintiffs did not discuss any such contingencies or conditions with the defendant Estate of Dan Mancuso nor with any of its representatives." Since the evidence is conclusive that Glenn Sowders, attorney for the Mancuso Estate, not only discussed but actively assisted plaintiffs in negotiating the necessary lease agreement and in applying for the required liquor licenses, we presume that defendant Seller means to argue that neither the lease nor the liquor permits were *expressly* made contingencies or conditions of the sale contract. However, the absence of such express contingencies is not conclusive. As this court en banc said in Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W.2d 833, 852, "In construing ambiguous contracts the prime objective of the court is to ascertain and render effective the mutual intent and understanding of the parties. In its effort to reach that objective the court may consider the relationship of the parties, the subject matter of the contract, usages of the business, the surrounding facts and circumstances attending the execution of the contract, and the practical construction which the parties themselves have placed on the contract by their acts and conduct. (citing cases)." Here the conduct of Glenn Sowders, the Seller's attorney, indicated strongly that he regarded the purchaser's obtaining of a lease and of liquor licenses as conditions precedent to the Buyer's obligation under the contract. In construing a contract of doubtful meaning, the courts will also consider "the object or purpose which the parties sought to have accom-

plished by it." McDaniel v. Willer, Mo. App., 216 S.W.2d 144, 147; McIntyre v. McIntyre, Mo., 377 S.W.2d 421, 425. Thus the fact that defendant's witnesses understood that plaintiffs' purpose was to operate a restaurant on the premises and sell liquor by the drink is persuasive that both parties intended that the plaintiffs' obligations under the sale contract should depend on plaintiffs obtaining both a lease on the premises and the necessary liquor permits.

Based on the parol evidence that was properly received to explain the doubtful language of the sale contract, and on the application of the foregoing rules of construction, we conclude that both parties to the sale contract understood that the contract included two implied contingencies or conditions precedent to the parties' duty to complete the sale: first, that the Buyers be successful in negotiating a lease of the premises, and second, that the Buyers be able to obtain the required licenses to sell liquor by the drink.

The plaintiff Buyers' position is that neither of these conditions precedent were fulfilled at the time of the fire and that, therefore, the sale was not then consummated. The plaintiffs are on very solid ground in contending that the second condition (the securing of liquor licenses) was not fulfilled by the time of the fire. As to the first condition (the obtaining of a lease from the fee owner), there is some question whether the lease that the Buyers had negotiated with the owner of the premises was actually in effect at the time of the fire. Although it was signed by all the parties, it had not been unequivocally delivered to the Buyers. In any case, it contained a provision that it was "subject to and contingent upon Lessee obtaining a liquor license from the State of Missouri and the City of Kansas City, Missouri." In view of this provision, we conclude that the first condition (the obtaining of a lease) was likewise not fulfilled by the time of the fire on October 13.

But unfortunately for the plaintiff Buyers, that is not the end of the matter. The securing of a lease and of liquor licenses were conditions precedent to the plaintiff Buyers' duty to conclude the sale, but like other such conditions precedent, they could be waived or excused by a later contract between the parties which expressly or impliedly dispensed with the conditions. See the Restatement of Contracts, A.L.I., Secs. 296 and 297, and the supporting Missouri Annotations thereto. We must, therefore, consider whether the parties entered into such a later contract when on October 8, 1965, their respective attorneys signed the letter, quoted supra, which purportedly "summarizes our agreement with reference to the purchase price for Mancuso's Gondola Restaurant."

Contrary to the contract for the sale of the restaurant, which was prepared by a realtor on a printed real estate sale form, said letter of October 8, 1965, was drafted in its entirety by an experienced attorney to constitute a written record of the agreements reached by the Buyer and the Seller through their respective attorneys relating to how the balance of the purchase price was to be paid. It is obvious that said letter makes no reference either to the contingency that the Buyers be successful in negotiating a lease of the premises or to the contingency that the Buyer be able to obtain licenses to sell liquor by the drink. Robert DeWitt, who signed the letter on behalf of the Buyers, testified that despite the absence in the letter of any mention of the liquor licenses, he "felt that contingency was still uppermost in everybody's mind." If it was uppermost in his mind, it would seem most likely that he, a lawyer, would have insisted on the insertion of a clause to that effect. Instead, he approved the letter as drafted by Glenn Sowders, the Seller's attorney, which made him a co-trustee of the $25,650.00 fund, representing the balance due on the restaurant, and required him "to release this account upon presentation of a full and complete list of creditors who have filed claims against the Estate of Dan Mancuso within the six month period after the date of death of Dan Mancuso." This was the only condition or contingency expressed either verbally or in writing at the meeting of the two lawyers on October 8, 1965. Whatever thoughts about any additional contingency may have been in DeWitt's mind, there is no evidence that they were shared by Sowders or his client, the Seller.

This view of the agreement of October 8, 1965, is entirely consistent with Max Glass' explanation of the escrow arrangement, namely, "that Mancuso's owed everybody in town a pretty good sum of money, and I didn't want to turn any money over to them until I knew that these bills had been paid." It is also consistent with Max Glass' testimony that by October 8, 1965, the contingency of securing a lease had been fulfilled and that while the liquor license had not then been issued, he thought everything that had to be done was done and he was "quite sure" that that contingency also would be fulfilled. The testimony of Richard Glass was to the effect that the reason for not releasing the balance of the purchase price on October 8, was to make sure that all bills owed by the Mancuso Estate for the operation of the restaurant were paid by the Administratrix. Richard later qualified this testimony by adding that the money was also held in a joint account to see "whether or not we were going to operate * * * like I say, * * * our lease depended on * * * our liquor license", but he did not know of any agreement to that effect.

We have concluded that, in fact, there was *no agreement* to that effect and that the agreement evidenced by the signed letter of October 8, 1965, dispensed with the implied contingencies of the sale contract relating to securing a lease on the premises and liquor licenses. We also hold that the letter of October 8, 1965, was binding on the parties as it is supported by independent consideration. This consideration consisted first and foremost of the Buyers' right to continue to possess and to remodel

the restaurant premises—a right that was confirmed by the contemporaneous delivery to Robert DeWitt of an executed bill of sale to the restaurant. It is quite apparent to us that Max and Richard Glass approved this letter and delivered to Glenn Sowders, the Seller's attorney, their check for $25,-650.00 because Sowders had told them the previous day that unless the balance of the purchase price was paid, all remodeling of the premises would have to cease. At the same time, the Glasses were benefited (1) by the $25,650.00 being held in escrow by the two attorneys to the end that all preferred claims against the Mancuso Estate be paid, and (2) by Mrs. Mancuso advancing monies to the estate in order that all bills incurred in operating the restaurant from the death of Dan Mancuso to the closing on September 30 might be paid by the estate.

The applicable rules are stated in 17A C.J.S. Contracts § 328, p. 287–291, as follows: "Hence, in order that an unexpressed term may be implied, the implication must arise from the language employed in the instrument or be indispensable to effectuate the intention of the parties; * * *. Accordingly, there can be no implication as against the express terms of the contract; and the courts will be careful not to imply a term, * * * as to which the contract is intentionally silent, * * *."

█ Keeping in mind the above rules, we find nothing in the language employed in the binding written agreement of October 8, 1965, to support the trial court's finding that "the plaintiffs—did deposit the balance of the purchase price, to-wit, $25,-650.00 with the defendants, A. Glenn Sowders, Jr. and Robert DeWitt, as trustees, for the purpose of disbursing said funds to the creditors of the said seller upon consummation of the said sale." Specifically, we find no language in the letter of October 8, 1965, which could give rise to an implication that the trustees were to disburse the balance of the purchase price "upon consummation of the said sale." Nor

have we been able to discover in the evidence any intention of the parties—except possibly an undisclosed thought in Robert DeWitt's mind—that the balance of the purchase price was to be withheld by the trustees until "the consummation of the said sale" at some future time. The letter of October 8, 1965, states expressly that DeWitt agrees "to release this account upon presentation of a full and complete list of creditors who have filed claims against the Estate of Dan Mancuso within the six month period after the date of death of Dan Mancuso." Any implication that the money in the account was to be disbursed "upon consummation of said sale" would appear to us to refer to a time other than that expressly agreed to, and hence any such implication would be contrary to or against the express terms of the contract. From reading the entire letter of October 8, 1965, and in particular its terms as to interest earned on the account, DeWitt's duty to release the account, and the delivery of an executed bill of sale, it is our judgment that the omission in the letter of any reference to a later consummation of the sale was intentional, at least on the part of Glenn Sowders. No implied provision can be inserted to supply an obligation concerning which the contract is intentionally silent, even though without such provision the contract would be unwise or even operate unjustly. Conservative Federal Savings & Loan Ass'n v. Warnecke, Mo.App., 324 S.W.2d 471, 479, 480.

In holding that the letter of October 8, 1965, signed by the parties' respective attorneys, waived or excused the implied conditions precedent to the plaintiff Buyer's duty to conclude the sale, the Court is mindful of the well known rule of law that a waiver is an intentional relinquishment of a known right. As stated by this Court in Drannek Realty Co. v. Nathan Frank, Inc., 346 Mo. 187, 139 S.W.2d 926, l. c. 929, "a waiver must be shown by some positive act or by some positive inaction inconsistent with the right in question." However,

in the instant case, there was a positive act by the Buyers inconsistent with their contractual right to defer the payment of the purchase price until the liquor licenses were issued. This positive act was the delivery to Glenn Sowders, the Seller's attorney, of the Buyers' check for $25,650.00, together with the Buyers' approval of the letter of October 8, 1965, which expressly states only one condition for the release of said $25,650.00, namely, the presentation of a complete list of the creditors of the Mancuso Estate. The delivery of said money and the expression of the sole condition upon which the money would be released were inconsistent with the right to defer payment of the balance of the purchase price until the liquor licenses were issued.

The trial court made a further finding (No. 8, quoted supra) for which we find no substantial support in the evidence. The only evidence of any agreement between the parties relating to the plaintiffs returning possession of the restaurant to the defendant came from plaintiff Richard Glass, who testified that he told Ronald Mancuso that if the sale fell through, the Glasses would put the premises back the way it had been before the Glasses took possession. Ronald Mancuso himself testified that he had no discussion or agreement with Richard Glass or anyone relating to the plaintiffs securing a liquor license or restoring the premises if the deal did not go through.

In our view, Max Glass entered into the agreement of October 8, 1965, without misconceptions. He knew that Richard's application for liquor licenses had not yet been acted on, but in view of his own excellent reputation and Richard's careful compliance with the procedures for obtaining such licenses, he had no doubt that the licenses would be forthcoming. (The record indicates that he was right about this, as the Kansas City authorities did approve Richard's application on October 20, 1965.) Max Glass also thought that he had procured adequate insurance to protect his investment in the restaurant as a result of his conversation on October 7 with Altman of the insurance firm of Altman—Singleton & Co. This was his testimony in his deposition, and in addition, plaintiffs' petition expressly alleges in paragraph 7 of Count I that "on or about October 7, 1965, the plaintiffs did procure insurance coverage upon said premises _ _ _." Whether or not such coverage was procured on or about October 7, 1965, is the issue to be determined under Count II of plaintiffs' petition. Due to the unfortunate fire of October 13, 1965, said count will have to be tried, for by October 13, 1965, the sale contract of August 16, 1965, had been executed and the plaintiffs owned the restaurant at the time of the fire.

This Court is fully committed to the rule that decrees nisi are not to be set aside unless clearly erroneous. But in this case the trial Court's finding that the balance of the purchase price, to-wit, $25,650.00, was deposited with the respective parties' attorneys "for the purpose of disbursing said funds to the creditors of the said Seller upon consummation of the said sale," was *unsupported by any evidence* and therefore "clearly erroneous." Appellate review is in nature de novo in a suit for a declaratory judgment, which means that the Appellate Court, while deferring to the trial Court's findings on credibility and the weight of the evidence, must determine the facts and the law; and these determinations are made on the basis of the record of the trial and the applicable case law and not necessarily on the appellant's statements of fact or his legal authorities.

The findings, conclusions and judgment of the trial court are set aside and the cause is remanded with directions to enter new findings, conclusions and judgment in accordance with the views expressed herein.

SEILER, P. J., and STORCKMAN, J., concur.

HOLMAN, J., not sitting when cause was submitted.