**SO GOOD POTATO CHIP COMPANY, a Corporation, Appellant,**

v.

**FRITO–LAY, INC., a Corporation, Appellee.**

No. 71–1245.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1971.

Decided June 16, 1972.

Charles S. Sigoloff, J. E. Sigoloff, St. Louis, Mo., for appellant.

Thomas C. Shelton, Albert C. Tate, Jr., Robert W. Coleman, Atlanta, Ga., Stuart Symington, Jr., Jim J. Shoemake, St. Louis, Mo., for appellee; Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., Guilfoil, Symington & Petzall, St. Louis, Mo., of counsel.

Before GIBSON and HEANEY, Circuit Judges, and VAN PELT, Senior District Judge.*

VAN PELT, Senior District Judge.

This is an appeal from the district court's denial of injunctive relief for an

* Senior District Judge for the District of Nebraska sitting by designation.

alleged breach of a franchise agreement. Plaintiff, So Good Potato Chip Company, brought this action to permanently enjoin defendant, Frito-Lay, Inc., from manufacturing, selling, and distributing "Doritos," "Fandangos," and "Intermission" corn chips within the licensed territory granted by Frito-Lay to So Good under a franchise agreement dated September 29, 1957. Under that agreement, the plaintiff and defendant agreed that So Good was to be licensed to manufacture and distribute corn chips pursuant to secret formulae and processes and to distribute the corn chips within a prescribed area of Missouri and Illinois under the registered trademark "Fritos." The 1957 agreement is substantially similar to an earlier franchise agreement between the parties, executed November 10, 1945.

Prior to the present litigation, Frito-Lay introduced "Doritos," "Fandangos," and "Intermission" corn chips into the territory licensed to So Good for "Fritos." So Good claims that the three products are so similar to "Fritos" that they too are covered by the franchise agreement.

Chief Judge Meredith, in an opinion reported at 324 F.Supp. 280 (E.D. Mo. 1971), found that the franchise agreement contemplated only the sale of corn chips under the trademark "Fritos," thus leaving the defendant free to sell the other three products within the licensed territory. We affirm.

■ The trial court, whose findings are not to be set aside unless clearly erroneous,[1] determined that the sales of "Doritos," "Fandangos," or "Intermission" corn chips were not competitive with the sales of "Fritos" as the term "competitive" was intended by the parties in their 1957 agreement. In addition, the court found that the express terms of the agreement precluded any court-imposed "negative covenant" against Frito-Lay. These findings are amply supported by the evidence.

The 1957 agreement is quite long and comprehensive. However, only two or three provisions are material in deciding the question presented here. The only restraint against Frito-Lay distributing other corn chips in the licensed territory is found in Paragraph 23 of the agreement, which states: "The 'territory' referred to in this agreement is the area for which the rights herein specified are conveyed by the Company [Frito-Lay]. During the term of this agreement, the Company will neither authorize nor permit the use of its trademark 'FRITOS' on corn chips in the territory by anyone other than Licensee [So Good]." Paragraph 19(D) allowed Frito-Lay to cancel the agreement, "without liability or recourse," if So Good manufactured or sold "another product so similar to corn chips manufactured pursuant hereto as to be competitive." Paragraph 5 required So Good to "promote and develop, vigorously and consistently, 'FRITOS' in all of the territory hereinafter granted," and prohibited So Good from engaging "directly or indirectly at any time during the term of this agreement in the manufacture and/or sale of corn chips or similar products other than those prepared in accordance with the terms hereof and sold under the trademark 'FRITOS' . . . ." Since the contract itself has no similar prohibition against Frito-Lay, So Good argues that paragraphs 5 and 19(D) imply a "negative covenant" that Frito-Lay will also not manufacture or sell within the licensed territory corn chips which might be considered competitive to "Fritos."

So Good relies upon what is probably the "classic" implied negative covenant case, Parev Products Co. v. I. Rokeach & Sons, Inc., 124 F.2d 147 (2nd Cir. 1941). In that case, the plaintiff had given the

1. Rule 52(a), Fed.R.Civ.P.; Humble Oil & Refining Co. v. American Oil Co., 405 F.2d 803, 814 (8th Cir.), cert. denied, 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969); St. Louis Typographical Union No. 8 v. Herald Co., 402 F.2d 553, 557 (8th Cir. 1968) ("The court of appeals must indulge the presumption that the findings are correct.")

defendant an exclusive license to produce plaintiff's kosher cooking oil, Parev Schmaltz. The defendant renamed the product Nyafat and sales increased dramatically. Amiable relations between the two parties lasted 15 years, when the defendant began distributing another kosher cooking oil, Kea, in addition to Nyafat. The plaintiff brought suit to enjoin defendant's distribution of Kea. The parties' contract had no express prohibition against the defendant's distribution of a product such as Kea. While the court of appeals did not set forth exactly the implied negative covenant involved, it did hold that the plaintiff deserved some protection. It stated:

> "[A] court of equity should grant some protection to a person who parts with his formula for exploitation. Thus, a court would hardly have permitted the defendant from the inception of this contract to lock up the plaintiff's formula in a vault and freely market Kea. There is no reason to do so now." 124 F.2d at 150.

However, under the circumstances, the court was not sure what would constitute adequate protection. It therefore gave the plaintiff leave to continue the action in order to show what percentage of the cooking oil market Kea was taking from Nyafat. Perhaps because of the difficulty of making such a showing, no further action by the plaintiff is reported.[2]

■■ We believe the *Parev Products* case is distinguishable. Unlike *Parev Products*, the parties here have expressly touched on the point in controversy in the 1957 agreement. A covenant cannot be implied if the parties have either expressly dealt with the matter in the contract or have left the agreement intentionally silent on the point. Glass v. Mancuso, 444 S.W.2d 467, 478 (Mo. 1969); Conservative Fed. Sav. & Loan Ass'n v. Warnecke, 324 S.W.2d 471, 479 (Mo.App. 1959). We agree with the trial court that paragraph 23 of the 1957 franchise agreement expressly deals with the sale of products by Frito-Lay in the franchised territory, and thus precludes any implied covenant. As the trial court stated: "Consideration of the specific provisions of the agreement precludes the implication that any covenant against sales by Frito-Lay of the products at issue was intended by the parties." 324 F.Supp. at 281. Paragraph 23, quoted above, only prohibits the sales of "Fritos" by Frito-Lay. It does not prohibit the sale of such "similar" products as "Doritos," "Fandangos," and "Intermission."

■■ Even assuming that the contract in question does imply a negative covenant against Frito-Lay, the activities complained of by So Good do not violate any such implied provision. To imply a negative covenant in any written agreement normally requires that the court "rewrite" the parties' agreement. The covenant may be what the parties "intended," but it is not what they provided in the written agreement. For the most part, the court is constrained to imply the covenant because of the court's own notions of morality or "fair play." As stated by Corbin: "It must be admitted, or indeed asserted, that considerations of equity and morality play a large part in the process of finding a promise by inference of fact

---

2. This may be compared with So Good's dilemma in the lower court, where it was unable to show any irreparable harm from the alleged infringement of the 1957 franchise agreement. Because of our finding that there was no breach of that agreement, it is unnecessary to decide So Good's contention that it need not show a specific injury. *But see* Prentice v. Rowe, 324 S.W.2d 457, 463 (Mo.App. 1959) ("[W]ith no showing of actual or threatened injury to [plaintiff], he was entitled to no injunctive relief.") It is interesting to note that the senior vice president of Frito-Lay testified that the snack food market was unusual in that the introduction of new snack foods brings larger sales for the entire market, assuming that each product retains the same amount of "shelf space." T. pp. 181–182.

as well as in constructing a quasi contract without any such inference at all. The exact terms of the promise that is 'implied' must frequently be determined by what equity and morality appear to require after the parties have come into conflict." I A. Corbin, Contracts § 19, at 46 (1963) (footnote omitted).

Frito-Lay gave So Good the right to make "Fritos" in the licensed territory. After having given this right, any implied negative covenant would mean that Frito-Lay could not come back into that territory and effectively destroy So Good's use of the franchise. Such a construction of the parties' agreement would be a combination of what the parties intended and of what equity and justice demand. But Frito-Lay's introduction of "Doritos," "Fandangos," and "Intermission" corn chips does not violate such a construction of the contract.

Under such an interpretation of the contract, Frito-Lay was inferentially prohibited from distributing "competitive" corn chip products. A broad construction of the term "competitive" would include any snack item similar to "Fritos." But the evidence shows that the parties intended a more limited definition. At the time the 1957 agreement was made, both parties were distributing a wide variety of "snack food" items, both corn based and otherwise. In addition, the parties have continued to expand their lines of snack food items since 1957.[3] Thus So Good cannot argue that any snack food of a "similar nature"[4] as "Fritos" is prohibited by an implied covenant, since this would include almost all of the products produced by either party and would contradict the parties' clear intent in the 1957 agreement.

There was ample evidence from which the trial judge could find that the sales of "Doritos," "Fandangos," and "Intermission" corn chips were no more "competitive," as the parties used that term, than the sales of the other products, such as cheese flavored corn puffs ("Chee-tos"), onion flavored corn snacks ("Funyuns"), etc., introduced by either party since 1957.[5]

The evidence also establishes that the term "corn chips," of which "Fritos" is an example, has a very distinct meaning in the snack food trade, and that a "corn chip" is clearly distinguishable from a "tortilla chip," such as "Doritos," or a "popped corn chip," such as "Intermission." The shape, size, weight, seasoning, taste, and water content of "Fritos" was shown to be different from that of either "Doritos" or "Intermission." The manufacturing process for these two products was also different from "Fritos," so as not to be in violation of any implied covenant against Frito-Lay. As the trial court stated, "Doritos" and "Intermission" require "different machinery, cooking time, cooking temperature, and total processing time. They are packaged in distinctive packages, sold at different prices, and advertised separately." 324 F.Supp. at 281.

The trial court was also correct in finding that, even though "Fandangos" were made from the same corn base and used the same manufacturing process as "Fritos," the distinctive shape, color, and onion or pizza flavoring of "Fan-

---

3. The stipulation of facts filed by the parties in the trial court shows that since 1957, So Good has added, at various periods, 11 such items to its list of products, while Frito-Lay has added approximately 43 such items, not including "Doritos," "Fandangos," and "Intermission" corn chips.

4. See Parev Products Co. v. I. Rokeach & Sons, Inc., supra, 124 F.2d at 149.

5. There is no evidence that Frito-Lay did not act in good faith when it started distributing "Doritos," "Fandangos," and "Intermission" in the So Good territory. The products were developed in the course of Frito-Lay's extensive program of research and development. Frito-Lay's good faith is also shown by the fact that the president of So Good testified that Frito-Lay had offered So Good the distributorship for "Doritos" at the same discount So Good was offering its own distributors, but So Good refused because it wanted a larger discount.

dangos" sufficiently distinguished "Fandangos" from "Fritos."

Frito-Lay's distribution of "Doritos," "Fandangos," and "Intermission" corn chips was not in violation of the parties' 1957 agreement. The trial court's decision is affirmed.

Opinion on remand, see D.C., 344 F. Supp. 442.