STIX FRIEDMAN & COMPANY, INC.,
Plaintiff-Appellant,

v.

FIDELITY AND DEPOSIT COMPANY
OF MARYLAND,
Defendant-Respondent.

Nos. 37999 and 38027.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Feb. 28, 1978.

Lowenhaupt, Chasnoff, Freeman, Armstrong & Mellitz, Hugh R. Law, St. Louis, for plaintiff-appellant.

Barnard, Baer, Lee, Timm & McDaniel, James C. Brandenburg, St. Louis, for defendant-respondent.

WEIER, Judge.

Plaintiff Stix Friedman & Company, Inc., brought suit against its insuror, defendant Fidelity & Deposit Company of Maryland, to recover on an insurance policy for loss sustained by plaintiff through its alleged good faith acceptance of allegedly altered stock certificates. A jury returned a verdict for plaintiff in the sum of $25,000. Plaintiff voluntarily remitted $5,310.68 making a total of $19,689.32 in its favor. Thereafter, the trial court granted defendant's motion for judgment in accordance with its motion for a directed verdict at the close of all the evidence on the ground that the evidence failed to show that the certificates had been altered or fraudulently altered. The trial court, in the event its judgment was reversed on appeal, further denied defendant's alternative motion for a new trial. Plaintiff appeals, contending the trial court erred in granting defendant's motion for a judgment notwithstanding the verdict. Defendant appeals claiming that if the trial court erred in granting the motion for a judgment notwithstanding the verdict, it also erred in denying defendant's alternative motion for a new trial.

In the pertinent portion of the insurance contract defendant agreed "to indemnify and hold harmless the Insured for: . . . Loss sustained by the Insured . . . through the insured's having, in good faith and in the course of business, . . . purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon, any securities, documents or other written instruments which prove to have been (a) counterfeited or forged . . or (b) raised [1] or otherwise altered or lost or stolen . . . ." The dominant issues in the trial and on appeal are whether plaintiff sufficiently proved (1) that the instruments in question were "altered," (2) that plaintiff accepted the instruments "in good faith" and (3) that plaintiff suffered a "loss" as a result of its good faith acceptance of the altered instruments. In summary the facts are that plaintiff agreed to allow another brokerage company to exchange stock certificates held by plaintiff as collateral, that as part of the exchange plaintiff accepted two certificates representing 2,000 shares of stock in "Information Management International Corporation" apparently believing them to be certificates for "Information International Corporation" (the word "Management" had been crossed out in pencil), and that the stock actually received was worth much less than the stock plaintiff apparently thought it was getting. Because the issues involve whether plaintiff made a submissible case, we review the facts in detail.

Plaintiff Stix Friedman & Company, Inc., is a stock brokerage firm owned by William Stix Friedman. In 1972 the company was a member of the New York Stock Exchange but was principally engaged in trading over-the-counter securities.[2] Plaintiff

---

1. Webster's Third New International Dictionary gives as one definition of the word "raised," "to add fraudulently to the face value of (a bank check or other negotiable paper) by altering the writing, figures, or printing in which the sum payable is shown."

2. Mr. Friedman testified that "[a]n over the counter [stock] is one that is not listed on any national exchange. For instance, the banks in St. Louis, none of them are listed on a national exchange. Anheuser Busch is not listed. On the other hand there are many, many smaller companies, many of which are trading for less than a dollar a share that are trading over the counter."

hasn't done any business with the public since December 1972. On about December 1, 1971, while still active in the market, plaintiff agreed to clear stocks for White & Company, Inc. Mr. Friedman testified that "[w]hat happened was White & Company had been drafting stocks through First National Bank. The First National Bank, I believe, told Mr. White [president of White & Co.] that they didn't want to draft any of his securities any more, and he asked if we would draw draft on them . . . [W]e agreed to draw drafts for White & Company . . . They have serious problems and there were a number of brokers and dealers who were no longer willing to do business with White & Company. I did not envision this as a running account. I thought everything would be on a strictly cash basis and it turned out not to be." Friedman also stated that White & Company had been suspended by the New York Stock Exchange. White denied this but he did acknowledge that the company's seat on the Midwest Stock Exchange (which was in the name of White's brother) was under a suspension "for a period of time in 1971 until we rearranged certain business transactions."

A letter drawn up by Friedman and signed by White dated January 26, 1972, set out the amount plaintiff would be paid for each draft it cleared for White & Company. The letter also states that White and Company agrees to let plaintiff "have some extra collateral in the amount of $15–20 thousand in the event that from time to time one of your drafts may not clear." Pursuant to this agreement White & Company delivered to plaintiff 600 shares of Sea World, Inc., stock, which at that time had a value in excess of $20,000. Although at one point Mr. Friedman stated that the agreement outlined in the letter had not been modified, he later acknowledged that it was his understanding with Mr. White "after this letter" that the collateral was also to be held for other transactions such as sales. In other words, Friedman believed the collateral was a margin on White & Compa-

ny's account. He also testified that it was the custom in an account such as this not to release the collateral stock if there is a debit balance. Mr. White, on the other hand, testified that plaintiff was holding the collateral solely to cover the situation where a draft would not be picked up by a broker on the other side of the transaction. After numerous transactions between these parties White & Company owed plaintiff in excess of $20,000 in February 1972. This debit balance arose because White & Company was often slow in delivering certificates of volatile stock to plaintiff.

On or before February 25, 1972, Mr. White proposed to exchange the Sea World, Inc., stock held by plaintiff as collateral for some other stock. Friedman said his company frequently permitted such an exchange. He also testified that White proposed to deliver 2,000 shares of "Information International" stock in exchange for the Sea World, Inc., stock. Friedman checked the value of 2,000 shares of Information International and found it to be worth about $25,000 on February 25, 1972. White, however, testified that he had proposed to substitute "Information Management International" stock for the Sea World, Inc., stock. Two thousand shares of Information Management International Stock was worth about $310.68 on February 25, 1972.

When the stock certificates were delivered by White & Company, Mary Charyle Weber, whose deposition was read into evidence, worked for plaintiff taking in and sending out stocks and bonds. She stated that if the validity of a security was doubtful in some way that she had primary responsibility to decide whether or not to accept it and if she had a question she would consult her supervisor. In response to a question about "what specific instruction did you get at Edward Jones and Company [her previous employer—also a stock brokerage company] and at Stix Friedman with regard to the receiving and classifying of securities, documents," she stated, "If

there was any question about the name of the security, such as any markings had been put in or any words added, I was first to check this list that we had which showed name changes. If I couldn't find it there or if I had any further questions, I was to go to my supervisors and ask them." On or before February 25, 1972, Mrs. Weber heard from Mr. Friedman that some stock would be coming in from White & Company. On that day a messenger from White & Company brought in two stock certificates and gave them to Mrs. Weber. She noticed that "the name on the security was not the name I was told to expect . . . The title wasn't the same and, also, it had been scratched out. I didn't know whether that meant it was still an okay certificate. I was told it had been, in other circumstances, but I was leery from the securities coming in from White and Company." The two certificates, introduced into evidence, stated in large black lettering near the top "Information Management International Corporation." On both certificates the word "Management" had been crossed out several times with a pencil, but this word was still clearly visible. In smaller lettering near the middle of both certificates there was again printed "Information Management International Corporation" without any extraneous markings. Mrs. Weber took the certificates to her supervisor, Bob Dunlap,[3] and showed them to him. "He said it is okay, it is a security change . . . a change of name." After Mr. Dunlap gave his approval Mrs. Weber "went out and checked it in this book, anyway. We had a book where you could find change of names. They came out with a new paper or pamphlet every so many months, of changes of names and companies, and so, supposedly, if it hadn't just happened, you could find it in there. You could find the old name in there. I checked it in the book." Mrs. Weber did not find any change from Information Management International to Information International. She then paid the messenger and gave him a receipt for 2,000 shares of "Information International Corp."

stock. The certificates were actually shares of "Information Management International Corporation" stock rather than shares of "Information International Corporation" stock. Mr. Friedman first saw the certificates at the close of business that day. White was informed the certificates delivered had a lesser value but White never made "good on the deal." When plaintiff ceased dealing with White & Company and closed their account, White & Company owed plaintiff "something in excess of $30,000.00."

In an effort to prove that its acceptance of the certificates in question was in good faith, Friedman testified that it was the practice of stock brokers to accept a stock certificate with a marking on it under circumstances where the name of the company had been changed or where there was a merger with another company. Newly printed certificates after the change were not always available. On cross-examination, he admitted that in this instance his clerks were "probably not as diligent or as sophisticated as they should have been." As to whether the appearance of penciled lines on the front of the certificate were "red flags" to investigate the issue, he replied, "I suppose there were a lot of red flags on that certificate. I'm not questioning that."

On the other hand defendant's expert witness testified that the practice followed throughout the brokerage industry was never to accept certificates like those in this case without determining that a name change had been recorded in a regular trade publication such as "Standard & Poor" digest or in "trading sheets." Witness Weber, plaintiff's receiving clerk, had found no listing of such a change and had failed to communicate this to Mr. Friedman.

"When the party having the burden of proof has adduced substantive evidence on a pleaded issue, that issue should be submitted to the jury and it is reversible error to direct a verdict against that party . . .

---

3. Dunlap was not available to testify at the time of trial.

[I]t is our duty to view the evidence before the trial judge who directed the verdict against the plaintiffs in a light most favorable to the plaintiffs and indulge in all reasonable inferences from the evidence in their favor. Except when unreasonable or opposed to physical laws, plaintiffs' evidence must be taken as true. However, we must find substantial evidence supporting plaintiffs' claim; a mere scintilla of evidence is not sufficient." *Kaelin v. Nuelle,* 537 S.W.2d 226, 229–30[2–4] (Mo.App.1976).[4]

Guided by these principles, we first consider whether the certificates in question were "altered" within the meaning of the insurance policy. The trial court held that the certificates had not been so altered. Plaintiff contends the definition of "altered" adopted by the trial court and defendant is incorrect. The allegedly erroneous definition, borrowed from contract and negotiable instrument law, appears in Instruction No. 4 and states that "an alteration is an act done upon a written instrument by a party thereto or by a person claiming thereunder which changes its language so as to materially affect the rights and obligations of the parties." This definition would be proper if plaintiff were seeking to be discharged from a contract because of a material alteration in the terms of an agreement made on a written contract by the other party[5] but it is not proper where the only issue is whether these certificates have been "raised or otherwise altered" within the meaning of this insurance policy. The policy does not require that the alteration be material. It is designed to protect plaintiff from losses arising from plaintiff's good faith acceptance of documents which have been "(a) counterfeited or forged . . . or (b)

raised or otherwise altered or lost or stolen . . . ." without any requirement as to the degree or type of alteration involved. These certificates were "altered" within the meaning of the insurance policy. The trial court erred in ruling otherwise. The judgment for defendant cannot be sustained on this ground. But this does not end our inquiry. If the action of the court in sustaining the motion for judgment notwithstanding the verdict is supported by any of the grounds raised by defendant in its motion, carried forward in its brief and would support a judgment in its favor, the trial court judgment will be affirmed. *McClellan v. Highland Sales & Investment Co.,* 514 S.W.2d 371, 374[1] (Mo.App.1974). *See also, Powers v. Shore,* 248 S.W.2d 1, 4[1] (Mo. banc 1952); *Auffenberg v. Hafley,* 457 S.W.2d 929[36] (Mo.App.1970). The first such ground upon which defendant urges this court to affirm the trial court judgment is plaintiff's alleged failure to prove good faith.

Plaintiff accepts defendant's definition of good faith as "an absence of all information or belief of facts that would render the transaction unconscientious." *Gray v. Clement,* 296 Mo. 497, 246 S.W. 940, 944[8] (1922). This is similar to the definition of good faith given to the jury in Instruction No. 5. This instruction stated: "The Court instructs the jury that 'good faith' means freedom from knowledge of circumstances which ought to put a person upon inquiry. This includes the exercise of reasonable discretion under the circumstances, and an honest effort to ascertain the facts and to make a determination based on such ascertained facts." It has been stated that "'good faith' is more than a state of mind. Under these circumstances it may also be a concrete principle upon which the world's

4. "We say *substantial* evidence, because the 'scintilla' doctrine is no longer the rule in this jurisdiction." Lamm, J. in *Williams v. Kansas City Southern Ry. Co.,* 257 Mo. 87, 165 S.W. 788, 796 (Banc.1914); *see also, S. S. Kresge Co. v. Unemployment Compensation Commission,* 349 Mo. 590, 162 S.W.2d 838, 840[5] (1942).

5. *See,* § 400.3–406 and § 400.3–407 RSMo 1969; *First National Bank of Fredonia v. Meadows,* 460 S.W.2d 604 (Mo.1970) (promissory notes);

*Robb v. N. W. Electric Power Cooperative,* 297 S.W.2d 385 (Mo.1957) (deed granting an easement); *Bader Automotive & Industrial Supply Co., Inc. v. Green,* 533 S.W.2d 695 (Mo.App. 1976) (restrictive employment agreement); *Mayfield v. Stoops,* 262 S.W.2d 299 (Mo.App. 1953) (promissory note); *Bente v. Finley,* 83 S.W.2d 155 (Mo.App.1935) (chattel mortgage). *See generally,* 3 C.J.S., Alteration of Instruments; 4 Am.Jur.2d Alteration of Instruments.

business is daily transacted. A breach of good faith is not so wholly within the realm of the mind that it cannot be reasonably inferable. Even the state of a man's mind is reasonably inferable from what he says (or fails to say) and what he does (or fails to do) under certain circumstances . . . It has been held that 'good faith' is not an abstract thing, but 'is a concrete quality, descriptive of the motivating purpose of one's act or conduct when challenged or called into question.'" *Krone v. Snapout Forms Co.,* 360 Mo. 821, 230 S.W.2d 865, 869 (1950). The definition of good faith agreed to by the parties and appearing in the jury instruction goes beyond a requirement of a mere subjective, innocent and honest belief in the lawfulness and correctness of some action. This subjective definition is the basic definition of good faith under § 1–201(19) of the U.C.C. (§ 400.1–201(19) RSMo 1969), sometimes referred to as the white heart—empty head standard, where the actual belief rather than the reasonableness of that belief is the controlling criteria. Anderson, Uniform Commercial Code § 1–201:60 (1970). In addition to this basic requirement, the parties' definition and jury instruction require that plaintiff's acceptance of the certificates be reasonable under the circumstances. In terms of the U.C.C. this means that the action be "commercially reasonable." *See,* U.C.C. § 8–318 (§ 400.8–318 RSMo 1969); Anderson, Uniform Commercial Code § 1–201:60 to 1–201:64 (1970). *See also, Phillips v. Whittom,* 354 Mo. 964, 192 S.W.2d 856, 857[2] (1946) wherein it is said: "Good faith, however, generally imposes a duty on the obligor to use reasonable diligence—the diligence that an honest man of ordinary prudence is accustomed to exercise." *See generally,* 35 C.J.S. Faith, pp. 605–08.

Whether plaintiff's acceptance of these certificates was in good faith as defined above depends on plaintiff's evidence of the reasonableness of its actions under the circumstances. The question for this court is not whether there is more evidence of good faith than of bad faith (obviously there is much evidence that plaintiff's action was not reasonable); the issue is only whether there is substantial evidence of good faith. Mr. Friedman testified that brokers sometimes accept securities with marks on them, such as when there has been a name change. Mrs. Weber also said certificates like the ones in question had been "okay" in other circumstances and that within her experience it had never been the case (before this case) that such altered documents were not valid. But these witnesses never stated that they or any other broker would accept such altered documents without first verifying the fact of a name change. Mr. Friedman acknowledged that he sometimes relied on assurances from other brokers but he never said he or any other broker would rely on assurances from Mr. White, a person whom Mr. Friedman admitted had a bad reputation for truthfulness in the investment community. The evidence that brokers sometimes accept certificates with marks on them, that plaintiff had never before had a problem with altered documents and that Mr. Friedman would rely on the assurances of another broker does not rise to the level of substantial evidence of reasonableness and good faith. The trial court judgment for defendant is sustainable on this ground on the facts of this case.

The judgment is affirmed.

GUNN, P. J., and KELLY, J., concur.