**KANSAS CITY POWER & LIGHT COMPANY, a Missouri corporation, Appellee,**

v.

**FORD MOTOR CREDIT COMPANY, a Delaware corporation; McDonnell Douglas Finance Corporation, a Delaware corporation; HEI Investment Corp., a Hawaii corporation, Appellants.**

**No. 92–2185.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1993.

Decided June 15, 1993.

Steven Phillips, Seattle, WA (Mark S. Foster and Jeffrey A. Befort, Kansas City, MO, on brief), for appellants.

Karl Zobrist, Kansas City, MO (William Sanders and Roger W. Slead, on brief), for appellee.

Before WOLLMAN and BEAM, Circuit Judges, and NANGLE,* Senior District Judge.

WOLLMAN, Circuit Judge.

Kansas City Power & Light Company ("KCPL") instituted this declaratory judgment suit to obtain a determination that it had properly redeemed $10,000,000 worth of preferred stock (the "$12.875 stock") held by three institutional investors, Ford Motor Credit Corporation ("Ford"), McDonnell Douglas Finance Corporation ("McDonnell Douglas"), and HEI Investment Corporation ("HEI"). (Collectively, the three holders of the $12.875 stock will be referred to as the "Investors.") The Investors counterclaimed for breach of the Stock Purchase Agreement under which they had originally bought the $12.875 stock from KCPL. The Investors sought $2.2 million in damages for dividends and premiums lost as a result of what they characterized as a "premature redemption." The case was tried to a jury, which returned a verdict in favor of KCPL. The district court[1] denied the Investors' motion for judgment as a matter of law, or, in the alternative, for a new trial. The Investors have appealed, asserting that the district court erred in not granting their motion for judgment as a matter of law, in giving an erroneous instruction defining "good faith," and in several other rulings. We affirm.

## I.

In June 1984, in an effort to raise capital, KCPL negotiated the Stock Purchase Agreement (the "Agreement") with the Investors. The Agreement provided that KCPL would issue 100,000 shares of preferred stock at a purchase price of $100 per share, which was also the stock's stated par value. Ford purchased 50,000 shares for $5 million; McDonnell Douglas purchased 20,000 shares for $2 million; and HEI purchased 30,000 shares for $3 million.

The Agreement provided that KCPL would pay an annual dividend of $12.875 per share. The transaction was arranged as a preferred stock purchase so that the Investors could take advantage of a beneficial tax provision known as the dividends received deduction (the "DRD"). The DRD allowed corporate recipients of qualified dividends to deduct 85% of such dividends from income. When combined with the then-existing corporate tax rate of 46%, the $12.875 dividend and the DRD produced an annual after-tax yield of 11.987%.

The Agreement contemplated a life of seven years for the $12.875 stock. The Agreement contained a sinking fund provision that required KCPL to redeem the 100,000 shares at par in three equal installments over three years beginning on June 1, 1989. Additionally, the Agreement gave KCPL the unqualified option to redeem all the shares as of June 1, 1988, in exchange for a six dollar per share premium (i.e., at a redemption price of $106 per share).

The Agreement also contained a tax indemnification clause. Paragraph 5.2(b) stated that if the Investors, for any reason, suffered a reduction of their after-tax yield by virtue of a disallowance of or reduction in the DRD, they could require KCPL to make

---

* The HONORABLE JOHN F. NANGLE, United States Senior District Judge for the Eastern District of Missouri, sitting by designation.

1. The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

indemnity payments sufficient to restore the Investors' after-tax return to 11.987%.[2] Any demand notice for an indemnity payment by the Investors, however, triggered a countervailing right in favor of KCPL to immediately redeem all of the $12.875 stock at par. Additionally, paragraph 5.2(b) gave KCPL the right to redeem at par, even without having received any demand notice, if it first made a "good faith determination that there [was] substantial risk that it would be required to make any indemnity payments." Finally, paragraph 5.2(b) provided that the Agreement's indemnification provisions survived any purchase, redemption, or transfer of the $12.875 stock.

On October 22, 1986, President Reagan signed into law the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085 (the "1986 Act"). Among the many changes it introduced into the federal tax laws, the 1986 Act reduced the DRD for most qualifying corporations from 85% to 80%, effective January 1, 1987. *Id.* § 611(a)(1). The 1986 Act also reduced the maximum corporate income tax rate from 46% to 34%, but the reduction was not scheduled to take effect until July 1, 1987. *Id.* § 601(b).

Following enactment of the tax law changes in October 1986, KCPL's management investigated the effect of those changes on the several issues of preferred stock that the utility had outstanding, including the $12.875 stock. At a January 8, 1987 meeting of the Executive Committee of KCPL's Board of Directors, Lou Rasmussen, the utility's chief financial officer, presented the results of management's analysis of the 1986 Act. Rasmussen told the Executive Committee that KCPL faced a substantial risk that it would be required to make tax indemnity payments to the Investors, and therefore recommended that the utility should redeem the $12.875 stock and another issue of preferred stock sold under a similar purchase agreement. The Executive Committee accepted Rasmussen's recommendation and unanimously voted to redeem all of the shares of the $12.875 stock. On January 9, 1987, KCPL sent notices to all three Investors that it was redeeming all of the $12.875 stock, with payment to be made on March 6, 1987.

On January 20–22, 1987, the Investors responded to the notices of redemption by sending letters to KCPL purporting to waive any rights they possessed to demand indemnity payments by virtue of the 1986 Act. In their letters, the Investors stated that because they had now removed any risk of future potential indemnity payments, the 1986 Act provided KCPL with no good faith basis to redeem the $12.875 stock.

KCPL rejected the Investors' letters as ineffective post hoc attempts to prevent KCPL from exercising its rights under the Agreement. Accordingly, on March 6, 1987, KCPL transferred to all three Investors payments covering the stock's par value, all accrued dividends, and all necessary indemnity payments up to that date.

Some three years later, in October 1990, KCPL filed the present declaratory judgment suit. The Investors counterclaimed for breach of contract. The parties agreed to submit only one issue to the jury: "Did [KCPL] make a *good faith determination*

---

**2.** Redacted to its essential provisions, Paragraph 5.2(b) of the Stock Purchase Agreement provided:

[I]f under any circumstances or for any reason whatsoever [an Investor] ... shall lose the benefit of, lose the right to claim, or suffer disallowance with respect to, all or any part of the Dividends Received Deduction with respect to dividends on the Stock (any such treatment, loss or disallowance being hereinafter call a "Loss"), then ... [KCPL] shall pay to such [Investor], not later than 60 days following written notice to [KCPL] by such [Investor] of such Loss, such sums as, when taken together with the dividends paid to such [Investor] ..., shall be required ... to cause such [Investor's]

effective after-tax yield with respect to such dividends and such Stock to be 11.987% per annum ...; *provided, however,* that if [KCPL] shall have received any such written notice of Loss or if [KCPL] shall have made a good faith determination that there is substantial risk that it would be required to make any indemnity payments pursuant to this Section 5.2 (regardless of whether [KCPL] shall have received any such written notice of Loss), then, in lieu of making any indemnity payments ..., [KCPL] ... shall have the right to purchase ... all, but not less than all, the Stock then owned by all [Investors] at $100 per share plus (i) [all accrued dividends] plus (ii) [all necessary indemnity payments up to the repurchase date].

that a *substantial risk* existed that [KCPL] would be required to make any indemnity payments to [the Investors] under Section 5.2(b) of the Agreement." The jury returned a verdict in favor of KCPL. The district court denied the Investors' post-trial motion for judgment as a matter of law, finding KCPL's evidence regarding its risk analysis to have been sufficient to warrant submitting the issue of good faith to the jury.

Our review focuses on KCPL's good faith determination of substantial risk. We must first determine whether the district court was correct in finding sufficient evidence of a good faith determination by KCPL to present a jury question. Second, the Investors ask us to consider the correctness of the district court's Jury Instruction Number 10, which defined "good faith" as a subjective lack of any intention to take unfair advantage of the Investors. Third, the Investors challenge the district court's admission of testimony by KCPL's officers regarding the likely actions that the Missouri Public Service Commission (the "MoPSC") would have taken if KCPL had not redeemed the $12.875 stock. Finally, the Investors assert that the district court erred by not giving the Investors' proposed jury instruction that the MoPSC was not a party to the Agreement.

## II.

The Investors first argue that the district court erred in not granting their post-trial motion for judgment as a matter of law. In reviewing the denial of a motion for judgment as a matter of law, we apply the same rigorous standard employed by the district court. In ruling on a post-trial motion for judgment as a matter of law, the district court must:

(1) consider the evidence in the light most favorable to the prevailing party, (2) assume that all conflicts in the evidence were resolved in favor of the prevailing party, (3) assume as proved all facts that the prevailing party's evidence tended to prove, and (4) give the prevailing party the benefit of all favorable inferences that may reasonably be drawn from the facts proved.

*Toombs v. Bell,* 915 F.2d 345, 348 (8th Cir. 1990). Having analyzed the evidence under those guidelines, "the district court must deny the motion if reasonable persons could differ as to the conclusions to be drawn from the evidence." *Id.*

The Investors initially argue that it was impossible under the terms of the Agreement for KCPL to have made a good faith determination of substantial risk caused by the 1986 Act's reduction in the DRD. They assert that the Agreement required KCPL to stand in the shoes of an Investor in determining whether a substantial risk existed that an Investor would make a demand for an indemnity payment. *See American Home Assurance Co. v. Baltimore Gas & Elec. Co.,* 845 F.2d 48 (2d Cir.1988) (construing a stock purchase agreement that contained a nearly identical tax indemnity provision). They claim that if KCPL had conducted its analysis from an Investor's perspective, it would have been forced to conclude that no Investor would make a demand for indemnity and thereby trigger KCPL's countervailing right to redeem at par.

In support of their claim, the Investors point out that the 1986 Act would have increased their yield on the stock's dividends in the long run. They acknowledge that the reduction in the DRD, by itself, would have lowered their rate of return by forcing them to pay income taxes on a larger percentage of the dividends. They demonstrate, however, that the reduction in the corporate income tax rate from 46% to 34% on July 1, 1987, would have more than offset the 5% reduction in the DRD. Thus, although the Investors' rate of return would have fallen below 11.987% for the six months in which the tax rate remained at 46% and therefore would have created a right to demand indemnity for the difference, the Investors would have received a rate of return greater than 11.987% for the remainder of the $12.875 stock's life after July 1, 1987.

Although the Investors do not dispute that the 1986 Act entitled them to indemnity payments for the six month period from January 1 to July 1, 1987, they counter that the amount of indemnity would have been small in comparison with the amounts they had

invested and expected to receive in return. They argue that it would have been economically illogical for them to demand the indemnity payment for only the six month loss when they would thereby have forfeited a valuable investment that they expected to produce substantial dividends for the next several years. They rest their argument on the fact, not disputed by KCPL, that market interest rates had fallen dramatically since the 1984 issuance of the $12.875 stock and that the Investors would have been unable to duplicate the stock's rate of return in the 1987 market. .

The Investors rely primarily on *American Home* to support their argument. In *American Home*, Baltimore Gas & Electric Co. redeemed preferred stock that had been sold under a purchase agreement similar to the one between KCPL and the Investors. 845 F.2d 48, 53 (Kearse, J., dissenting) (quoting the text of the tax indemnity provision). In affirming the district court's grant of summary judgment against Baltimore Gas, the Second Circuit construed the agreement's language to require that Baltimore Gas had to have considered the economic interests and predictable preferences of the investors in order to have made a good faith determination of substantial risk. *Id.* at 52. Because Baltimore Gas conceded that it had not considered the investors' likely desires, but only the mathematical potential for indemnity, the Second Circuit held that Baltimore Gas could not have acted in good faith as a matter of law. *Id.* The Investors claim that KCPL likewise considered nothing more than the mathematical possibility of indemnity liability and the savings to be garnered from the early redemption.

In response, KCPL argues that, unlike Baltimore Gas, it did consider the Investors' likely actions. It states that its chief financial officer and the Executive Committee realized that the Investors would not make any immediate indemnity demand and thereby risk losing their favorable investment. It asserts that its management and Executive Committee, however, did not rest their analysis of substantial risk on the premise of an immediate demand. Instead, it posits two situations which its management and Execu-

tive Committee considered and which allegedly would have created a substantial future risk of liability for indemnity payments.

Under the first theory, labelled the "lie-in-the-weeds" scenario, the Investors would not have demanded immediate indemnity, but would have allowed any indemnity amounts to accrue, demanding indemnity only after the scheduled redemption. KCPL argues that the survivability clause in paragraph 5.2(b) would have allowed the Investors to make such a post-redemption demand. It claims that the Investors would certainly have made such demands because the Agreement's terms clearly entitled them to indemnity payments for at least the first six months of 1987 and they would have faced no potential downside risk by demanding indemnity after KCPL had redeemed the $12.875 stock at the end of the Agreement's term.

Under the second theory, KCPL believed that there was a significant chance that the Investors would sell the $12.875 stock to property and casualty companies, which often hold this type of preferred stock and whose DRD had been reduced from 85% to 68% by the 1986 Act. KCPL asserts that the delayed reduction in the corporate tax rate would not have offset the decrease in the DRD for property and casualty companies and therefore would have created a substantial risk of large indemnity payments if the Investors had sold the stock to such companies in exchange for a share of the increased indemnity payments.

Before we can decide whether KCPL's evidence was sufficient to present a jury question on the issue of a good faith determination of substantial risk, we must first determine the standard by which the utility's conduct should have been measured. The operative language of the Agreement authorized KCPL to redeem if it first made "a good faith determination that there [was] substantial risk that it would be required to make any indemnity payments." Based on *American Home*, the Investors claim that this language obligated KCPL to consider the likely economic interests of the Investors in analyzing the risk of indemnity payments. KCPL responds that the Agreement placed

no duty on it to communicate with the Investors to learn their preferences.

Each claim is correct as far as it goes. We find the language of the Agreement to be unambiguous in its requirement that KCPL take into consideration the economic interests of the Investors in deciding whether a substantial risk existed. *See Busch & Latta Painting Corp. v. State Highway Comm'n*, 597 S.W.2d 189, 197–98 (Mo.Ct.App.1980) (under Missouri law, the court is to construe the meaning of a contract if the contract is unambiguous either on its face or in light of surrounding circumstances); *cf. John Deere Ins. Co. v. Shamrock Indus.*, 929 F.2d 413, 417 (8th Cir.1991) (court to construe insurance policy under Missouri law). Under the Agreement, the only condition triggering KCPL's obligation to make an indemnity payment was an Investor's delivery of an indemnity demand notice to the utility. Thus, KCPL's determination of substantial risk of making an indemnity payment necessarily should have focused, at least in part, on whether any Investor would deliver such a notice. *See American Home*, 845 F.2d at 51; *cf. Continental Assurance Co. v. Commonwealth Edison Co.*, 194 Ill.App.3d 1085, 141 Ill.Dec. 711, 715, 551 N.E.2d 1054, 1058 (1990) (implying that utility had a duty to consider the investors' interests). A mere numerical change in the DRD, by itself, would not automatically support a conclusion that an Investor would make an indemnity demand, especially where, as here, such a demand would contradict the Investor's financial interests.

■ On the other hand, we find no duty in the language of the contract that obligated KCPL to communicate with the Investors to ascertain the Investors' precise intentions. Where the parties' agreement either expressly addresses a matter or is intentionally silent on the matter, a court should not imply a duty that the contract does not contain. *See So Good Potato Chip Co. v. Frito–Lay, Inc.*, 462 F.2d 239, 241 (8th Cir.1972) (applying Missouri law) (citing *Glass v. Mancuso*, 444 S.W.2d 467, 478 (Mo.1969)). Here, the Agreement expressly required KCPL to make the determination of substantial risk, but it did not condition that decision on communicating with the Investors.

■ Having reviewed the trial transcript, we agree with the district court that KCPL introduced sufficient evidence to support a jury finding that KCPL had made a good faith determination of substantial risk. The parties do not dispute that the Investors' return for the six month period from January 1 to July 1, 1987, would have fallen below the guaranteed rate and would therefore have entitled the Investors to indemnity payments to make up the difference. Rasmussen and Arthur Doyle, KCPL's Chief Executive Officer and Chairman of the Board, testified that they had conducted financial analyses after the enactment of the 1986 Act that had confirmed the existence of the reduced return and the potential for indemnity. Additionally, Rasmussen testified extensively that he had analyzed the likelihood whether the Investors would, in fact, demand the indemnity to which they were entitled. He stated that because the Agreement provided for the survival of the Investors' right to claim indemnity beyond the redemption or transfer of the stock, he concluded that it was very likely that the Investors would not demand indemnity immediately, but would make a post-redemption demand when they had nothing to lose. Rasmussen testified that he had relayed this conclusion to the Executive Committee at its January 8, 1987 meeting, and his notes corroborate his testimony.

Additionally, the deposition testimony of Executive Committee member Robert West, entered into evidence at trial, corroborates Rasmussen's assertions that the Executive Committee considered the Investors' likely actions in deciding to redeem the stock. West testified that the Executive Committee realized that the Investors were sophisticated businesses that would be familiar with the tax laws and with the financial markets. Twice West stated that the Executive Committee had carefully considered Rasmussen's conclusion that the Investors would delay demanding indemnity until after a redemption.

Viewing Rasmussen, Doyle, and West's testimony in it most favorable light, we think that KCPL's "lie-in-the-weeds" theory pre-

sented a rationale sufficiently plausible to entitle a jury to find that KCPL had redeemed the stock in good faith based upon that theory. Section 5.2(b) required only that KCPL determine in good faith that it was likely to be required to make *any* indemnity payment. Given that the Investors would definitely be entitled to indemnity payments and that they could make their demand after redemption when they faced no downside risk, the jury was justified in validating KCPL's finding of a substantial risk.[3] Moreover, there was ample evidence demonstrating that KCPL had actually relied on this theory in its decision-making process.

The Second Circuit's opinion in *American Home,* upon which the Investors primarily rely, does not compel a reversal of the jury's verdict. In *American Home,* Baltimore Gas conceded that it had not considered the likelihood of an investor making a future demand for indemnity as KCPL did in this case. *American Home,* 845 F.2d at 52.

The Investors argue, nonetheless, that KCPL should have had to make a determination that the tax changes were so great that the fundamental economics of the transaction had been altered and a risk of a large indemnity payment created. Had the Investors wished to place such a restriction on KCPL, however, they should have written it into the Agreement. The Investors demanded that the Agreement contain a tax indemnity clause guaranteeing them a specified rate of return, and in return they gave KCPL the countervailing right to redeem when faced with the risk of making *any* indemnity payments. They should not now be heard to complain that they bargained away too much.

The Investors further attack the utility's "lie-in-the-weeds" theory by asserting that, in fact, no Investor would have made a post-redemption demand for indemnity. They claim that the market for preferred stock financing, such as the $12.875 issue, is so small that no rational investor would risk its reputation by "lying in the weeds" and making a post-redemption demand. This argu-

ment and the evidence supporting it raise only a factual dispute about the likelihood of a post-redemption indemnity demand. The jury considered this evidence and rejected it, as was its right.

■ Finally, the Investors claim that their waiver letters, sent after they had received the redemption notices from KCPL, precluded a good faith determination of substantial risk as a matter of law. They assert that once KCPL knew that the Investors would not file claims for indemnity as a result of the 1986 Act, KCPL had no basis upon which to continue to believe in a substantial risk of indemnity payments. Because the Investors sent their waiver letters after KCPL had exercised its right to redeem, however, those letters could not affect the Executive Committee's good faith in making its decision. As the Missouri Supreme Court has stated, "[I]t is a well settled law that a party may waive any conditions of a contract in his favor, but it is equally true that one party cannot by his waiver affect the rights of the other party to the contract." *Campbell v. Richards,* 352 Mo. 272, 176 S.W.2d 504, 505 (1944) (citation omitted). Whatever the effect the waiver letters might have had, had they been received before KCPL exercised its redemption rights, once KCPL had exercised its rights, the Investors' post hoc assertions were ineffective to repeal those rights.

### III.

■ The Investors next challenge the district court's Jury Instruction No. 10, which defined "good faith." We do not lightly overturn a district court's choice of words in charging the jury. "The form of the instructions is a procedural matter governed by federal law, and the district court has 'broad discretion to instruct the jury in the form and language it considers a fair and adequate presentation of substantive law.'" *H.H. Robertson Co., Cupples Products Div. v. V.S. DiCarlo General Contractors, Inc.,* 950 F.2d 572, 576 (8th Cir.1991) (quoting *Grogan v. Garner,* 806 F.2d 829, 836 (8th

---

**3.** Because we find KCPL's evidence concerning the "lie-in-the-weeds" theory to be sufficient to support a jury finding that KCPL made a good faith determination of substantial risk, we do not address its evidence concerning the transfer of the $12.875 stock to property and casualty companies.

Cir.1986) (other citation omitted)). Although a district court exercising its diversity jurisdiction must adequately set forth the appropriate state law, it need not give the precise instruction contained in the state's approved instructions or use the language suggested by either party. *See id.* In reviewing a district court's ruling on instructions, we must determine "whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Jones v. Board of Police Comm'rs.*, 844 F.2d 500, 504 (8th Cir.1988), *cert. denied*, 490 U.S. 1092, 109 S.Ct. 2434, 104 L.Ed.2d 990 (1989).

Although the parties dispute whether the instruction defining good faith should have been given an objective or subjective meaning, both parties agree that Instruction No. 10 actually defined good faith in a subjective manner:

> The phrase "good faith" as used in these instructions means the absence of any intention to take unfair advantage of the defendants by Kansas City Power & Light Company in the exercise of its contractual rights under Section 5.2(b) of the Agreement.

The district court derived this instruction from Missouri Approved Instruction (MAI) 16.03, the only definition of "good faith" in the MAI. MAI 16.03 was designed to be used in ejectment actions where there is a question whether a person who has improved property that turns out to be another's may force the true owner to reimburse the improver for the improvements.[4] The comment to MAI 16.03 cautions that if the definition is used in other than an ejectment case, the substantive law should be checked to determine the instruction's accuracy in the contemplated use.

The Investors contend that Instruction No. 10 allowed the jury to find that KCPL had exercised good faith even if it had, so to speak, stuck its head in the sand. The Investors assert that under this instruction the jury could have found for KCPL as long as

the Investors could produce no evidence that the Executive Committee knew that it was violating the Agreement and redeemed the stock nonetheless.

The Investors argue that the instruction defining good faith should have imposed an objectively measured duty on KCPL to ascertain certain facts in addition to possessing subjectively pure motives. They rely on the Second Circuit's opinion in *American Home*, which construed the entire phrase in Section 5.2(b) ("good faith determination that there is substantial risk that it would be required to make any indemnity payments") to require consideration of the investors' interests in light of the economic realities of the situation. 845 F.2d at 52. The Investors also rely on a Missouri Court of Appeals opinion that approved a definition of good faith as including "an honest effort to ascertain the facts and to make a determination based on such ascertained facts." *Stix Friedman & Co. v. Fidelity & Deposit Co. of Maryland*, 563 S.W.2d 517, 521 (Mo.Ct.App.1978).

In response, KCPL argues that Missouri's common law and its version of the Uniform Commercial Code (U.C.C.) define good faith as only a subjectively pure state of mind. The U.C.C. defines good faith as "honesty in fact in the conduct or transaction concerned." Mo.Ann.Stat. 400.1–201(19) (Vernon 1965).

"Good faith" is an amorphous concept, capable of many forms yet requiring none. What good faith means depends on the situation in which the term is used. Blacks Law Dictionary, 6th ed., defines the phrase, in part, as "an intangible and abstract quality with no technical meaning," and uses additional language that contains both subjective and objective components. Likewise, Missouri courts have defined good faith as being both a subjective and an objective concept. *Compare Stix Friedman*, 563 S.W.2d at 521 (approving instruction defining good faith in objective manner); *Phillips v. Whittom*, 354 Mo. 964, 192 S.W.2d 856, 857 (1946); *with Ganaway v. Shelter Mut. Ins. Co.*, 795 S.W.2d 554, 562 (Mo.Ct.App.1990) (in the

---

4. MAI 16.03 reads in full:
   The phrase "good faith" as used in this [these] instruction[s] means the absence of any inten-
   tion to defraud or take unfair advantage of anyone else who might have a better right than defendant to possession of the premises.

context of an insurer's duty to settle or contest a claim in good faith), *transfer denied* (Oct. 16, 1990); *Rigby v. Boatmen's Bank and Trust Co.*, 713 S.W.2d 517, 527, 533 (Mo.Ct.App.1986) (under Missouri's version of the U.C.C.).

We do not agree with either party's claim that Missouri's courts inflexibly require either a totally subjective or totally objective definition of good faith in all cases. In *Stix Friedman*, the Missouri Court of Appeals approved a definition of good faith that imposed an objective duty to ascertain the relevant facts and make an honest decision based on those ascertained facts. 563 S.W.2d at 521–22. The court was not fashioning its own definition, however. It was merely approving a definition to which both parties had agreed in light of the circumstances of the case. *Id.* Thus, we find that neither *Stix Friedman* nor the other cases cited by the Investors impose a blanket rule that good faith always be defined in an objective manner.

Likewise, KCPL has not convinced us that the district court was obligated to define good faith as a purely subjective state of mind. Even the U.C.C., upon which KCPL relies, states that its subjective definition of good faith may be altered where "the context requires otherwise." Mo.Ann.Stat. § 400.1–201. Moreover, the Missouri Court of Appeals, although characterizing the U.C.C.'s definition of good faith as a subjective one, has stated that "[t]o act with *honesty in fact* ... is to act without caprice or arbitrary purpose." *Rigby*, 713 S.W.2d at 533. Thus, one acting with good faith may not proceed upon a belief that is "bereft of rational basis nor amount[s] to an open abuse of [the party's] discretionary power." *Id.* (discussing good faith in the context of a call for additional collateral under section 1–208.) The court's use of the phrase "rational basis" in discussing the U.C.C.'s definition of good faith implies that Missouri's courts include some notion of objective investigation in the concept of good faith. *See Reid v. Key Bank of Southern Maine, Inc.*, 821 F.2d 9, 15 n. 2 (1st Cir.1987) (noting that some courts, commentators, and even drafters of the U.C.C. have believed that the U.C.C.'s definition of good faith contains both objective and subjective components and that, at any rate, the difference between "subjective" and "objective" standards is often minimal in practice).

As we stated earlier, we find that the entire operative phrase in the contract ("good faith determination that there was substantial risk that it would be required to make any indemnity payments") unambiguously imposed some form of objective duty on KCPL to ascertain the likely interests of the Investors. Thus, the district court's jury instructions as a whole should have contained language conveying this duty to the jury. Viewing the instructions as a whole in light of the evidence, we find that the instructions adequately submitted this issue to the jury.

Instruction No. 10 stated that to find that KCPL had acted in good faith the jury had to find that it had lacked any intention to take unfair advantage of the Investors. This is unquestionably a subjective standard and is not an incorrect statement as it stands. If Instruction No. 10 had been used alone, however, it might not have been sufficient, because it failed to require a finding that KCPL had determined the likelihood of an Investor's demand for the indemnity to which it was contractually entitled. Instruction No. 10, by itself, would have allowed the jury to find that the Executive Committee members, as respected, experienced business leaders in the Kansas City community, certainly could not have acted with an evil motive in deciding to redeem the $12.875 stock to the benefit of Kansas City Power & Light's shareholders and ratepayers. It also would have allowed the jury to find good faith even if the Executive Committee members had based their decision solely on the mathematical reduction in the DRD.

Instruction No. 10 was not given in isolation, however. The district court's instructions also contained a definition of "substantial." Instruction No. 11 defined "substantial" as meaning "true, real or likely to materialize" and as not meaning "imaginary or unlikely to materialize." This instruction properly limited the potential bases for the jury's decision, which is the essential function of jury instructions. When combined with the contract and the verdict-directing in-

structions, which tracked the operative language of the contract, Instruction No. 11 required the jury to find that KCPL had determined a real risk, not some imaginary hypothetical risk premised solely on a reduction in the DRD. Because the contract provided only one means of creating a risk of making an indemnity payment—a demand notice from an Investor—the jury's discretion was properly channelled into deciding whether KCPL had sufficiently studied and honestly considered the likelihood of receiving such a demand notice. That determination is all that the contract required.

## IV.

■ ▪The Investors also raise two issues involving the invocation of the MoPSC at trial that purportedly require the grant of a new trial. First, the Investors claim that the district court erred in admitting the testimony of Doyle and Rasmussen regarding the likely action that the MoPSC would take with respect to the utility's redemption of the $12.875 stock under Section 5.2(b). Doyle and Rasmussen testified that they believed that the MoPSC would have required them to exercise their redemption rights in order to avoid having to make any indemnity payments to the Investors. They also testified that they believed that the MoPSC would not have allowed them to recognize the validity of the Investors' waiver letters because the MoPSC would have considered the acceptance of those waivers to have been an amendment to the Agreement.

The Investors challenge this testimony as violating Federal Rule of Evidence 602, which prohibits testimony that is not the product of the witness' personal knowledge. They assert that KCPL introduced no evidence that any of its employees contacted the MoPSC regarding the redemption. Thus, they argue that any testimony regarding the likely actions of the MoPSC constituted speculation as to the state of another's mind or an inappropriate legal conclusion.

"The decision whether to admit evidence is within the broad discretion of the district court and will not be overturned absent a clear abuse of discretion." *Anderson v. United States,* 788 F.2d 517, 520 (8th Cir.

1986). We find no abuse of discretion here. Doyle and Rasmussen testified concerning how they thought the MoPSC would react to a decision by KCPL not to redeem the $12.875 stock. Based upon their thirty to forty years' experience dealing with the MoPSC, Doyle and Rasmussen had personal knowledge as to the agency's likely reaction to any action taken by KCPL. Whether the MoPSC, in fact, would have reacted the way Doyle and Rasmussen predicted is irrelevant because the issue in the case centered on the decision-making process of KCPL's employees. Accordingly, the district court did not err in finding that Rule 602 had been satisfied.

■ Finally, the Investors seek a new trial on the ground that the district court failed to give a withdrawal instruction regarding the MoPSC. In his opening statement, counsel for KCPL asserted that the MoPSC was, in effect, a party to the Agreement. The Investors argue that the district court therefore should have instructed the jury that the MoPSC was not an actual party to the Agreement that had any rights in interpreting or enforcing the Agreement, but only had to give regulatory approval of the Agreement at the time of its execution. The Investors assert that the district court's failure to give such a withdrawal instruction allowed the jury to find that KCPL was legally obligated under the MoPSC's direction to redeem the $12.875 stock.

As stated earlier, the district court has considerable discretion in charging the jury and need not give every proposed instruction that the parties seek as long as the court adequately presents the law and the issues to the jury. *See H.H. Robertson,* 950 F.2d at 576. In this instance, the district court stated that it had decided not to give the Investors' proposed withdrawal instruction because counsel's reference to the MoPSC in his opening statement was adequately explained to the jury by the evidence, making it unnecessary for the district court to caution the jury that the MoPSC was not an actual party to the Agreement. Having reviewed the record, we find no error in the district court's ruling on this issue.

## V.

In sum, we hold that the Agreement's language required KCPL to consider the Investors' likely economic interests in determining whether it would be required to make any indemnity payments. KCPL introduced sufficient evidence to support a jury finding that it had indeed made its determination of substantial risk in good faith. Moreover, the district court's jury instruction defining good faith did not constitute error because the instructions as a whole adequately presented to the jury the issue of KCPL's duty under the Agreement. Finally, the district court did not err in admitting testimony concerning the MoPSC's possible responses and in refusing to give the Investors' proposed withdrawal instruction regarding the MoPSC's connection to the Agreement.

Accordingly, the judgment of the district court is affirmed.