# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-4081

_____

| | | |
|---|---|---|
| Phillip Kelly,  Trustee, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | Appeal from the United States District |
| David Armstrong; Hannah Armstrong; | * | Court for the District of Nebraska. |
| Omaha State Bank; David N. | * | |
| Armstrong, Executor of the Estate | * | |
| of Theodore F. Armstrong, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted:  November 17, 1999

Filed:  March 3, 2000

_____

Before RICHARD S. ARNOLD, FLOYD R. GIBSON, and BEAM, Circuit Judges.

_____

BEAM, Circuit Judge.

Phillip Kelly,  the trustee of David and Hannah Armstrong's bankruptcy estate (the Trustee), brought this action under 11 U.S.C. § 548(a).  He alleged both actual and constructive fraud and sought to set aside four pre-bankruptcy transfers.  The case was tried to a jury.  The jury found in favor of the defendants and the Trustee appealed.  We reversed and remanded on a jury instruction issue.  The case was tried again and the jury again returned a verdict in favor of the defendants on all four claims.  The district

court denied motions for a judgment as a matter of law and a new trial. The Trustee now appeals and we affirm.[1]

## I.    BACKGROUND

This is the fourth appeal in a thirteen-year-old case with a long and complex history.[2] See Abbott Bank-Hemingford v. Armstrong, 931 F.2d 1233 (8th Cir. 1991) (Armstrong I); Abbott Bank v. Armstrong, 44 F.3d 665 (8th Cir. 1995) (Armstrong II); Kelly v. Armstrong, 141 F.3d 799 (8th Cir. 1998) (Armstrong III). Because the facts that gave rise to David and Hannah's bankruptcy are fully recounted in our opinion in Armstrong I, we now set forth only the facts relevant to this appeal.

In October of 1986, David and Hannah made four property transfers. These were questionable transactions. First, David sold 1800 shares and transferred the majority interest in the Maverick Land and Cattle Company (Maverick) to his father, Theodore, for $79,920. Maverick is a closely-held corporation in which David and Theodore were the sole shareholders. Second, Omaha State Bank increased Maverick's credit line from $200,000 to $600,000, in exchange for a pledge by Theodore of $780,000 in marketable securities. Maverick borrowed against this credit line to repay Theodore $157,700, in partial satisfaction of an outstanding debt. Shortly after this transaction, Theodore purchased David and Hannah's residence for that exact amount. Third, David pledged his remaining shares of Maverick to Omaha State Bank as additional security for the increased credit line. Fourth, David and Hannah pledged two vehicles to Omaha

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

[2]David and Hannah Armstrong, and David as the executor of Theodore Armstrong's estate made a motion to incorporate the record from the prior appeal in this case. We grant this motion, but note that the supplemental information was not relevant to our decision.

State Bank to secure the increased credit line, although Omaha State Bank neither requested nor required them to do so. Finally, with the money that David and Hannah received from the stock sale and the home sale, they purchased annuities that were exempt from execution in bankruptcy under Nebraska law. See Neb. Rev. Stat. § 44-371 (1984).

David and Hannah then filed for bankruptcy on December 31, 1986. As a result of these transactions, all of David and Hannah's previously unencumbered assets either were encumbered in favor of Omaha State Bank, to the detriment of other creditors, or were sold and the proceeds were placed in exempt annuities. Marvin Schmid, Omaha State Bank board member and eventual Chairman, was a personal friend of Theodore's, and Schmid's former law partner has represented Theodore,[3] David and Hannah throughout these proceedings.

The Trustee now appeals the second jury verdict. He contends that the denial of the motions was in error. He also asserts that the district court failed to properly instruct the jury in accordance with our remand. Finally, he asserts that the district court abused its discretion in admitting irrelevant and confusing evidence.

## II.    ANALYSIS

### A.    Motions for Judgment as a Matter of Law and New Trial

The Trustee contends that the evidence presented at trial was insufficient to support the jury's verdict, and therefore he is entitled to either a judgment as a matter of law or a new trial. We are, however, very reluctant to set aside a jury's verdict and

---

[3]Theodore Armstrong died on May 19, 1997. David, as executor of Theodore's estate, was substituted for him in this appeal.

will not do so lightly.  See Fox v. T-H Continental Ltd. Partnership, 78 F.3d 409, 413 (8th Cir. 1996).

We review de novo the district court's denial of a motion for a judgment as a matter of law.  See id.  In making this determination "[i]t is well settled that we will not reverse a jury's verdict for insufficient evidence unless, after viewing the evidence in the light most favorable to the verdict, we conclude that no reasonable juror could have returned a verdict for the non-moving party."  Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir. 1997) (en banc); see also Fed. R. Civ. P. 50(a).  In considering the evidence presented at trial, we will not weigh or evaluate it nor will we consider questions of credibility.  See Fox, 78 F.3d at 413.

We review a district court's denial of a motion for new trial for an abuse of discretion.  See Peerless Corp. v. United States, 185 F.3d 922, 927 (8th Cir. 1999).  The district court's decision to deny a motion for new trial is "'virtually unassailable'" when the basis for the motion is insufficient evidence.  Id. (citations omitted).  We will only reverse if there was a clear abuse of discretion demonstrating an "'absolute absence of evidence to support the jury's verdict.'"  Id. (quoting Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1123 (8th Cir. 1999)).

Although the standards for granting a motion for judgment as a matter of law and new trial are different, those differences are irrelevant to this case because we conclude that the evidence presented at trial was sufficient to support the jury's verdict under either standard.

In Armstrong III, we recognized that it is difficult for a trustee to present adequate direct evidence of fraud by the bankrupt.  141 F.3d at 802.  As a result, courts look for common indicia or "badges of fraud" which include but are not limited to: "(1) actual or threatened litigation against the debtor; (2) a transfer of all or substantially all of the debtor's property; (3) insolvency on the part of the debtor; (4) a special

relationship between the debtor and the transferee; and (5) retention of the property by the debtor after the transfer." Id. If there is a confluence of the "badges of fraud," then the Trustee is entitled to a presumption of fraudulent intent. See id. To overcome the presumption, a "'legitimate supervening purpose'" for the transfers must be shown by the bankrupt. Id. (quoting In re Acequia, Inc., 34 F.3d 800, 806 (9th Cir. 1994)).

The Trustee contends, with respect to each transfer, that he proved a confluence of the badges of fraud and that the defendants were unable to present a "legitimate supervening purpose" that was sufficient to meet the legal standard. We disagree.

### 1.    The Sale of Maverick Stock to Theodore

On October 6, 1986, David and Theodore, as sole shareholders and directors of Maverick, approved the sale of 1800 shares of stock from David to Theodore.  The Trustee alleges that the following badges of fraud were present: (1) the Bank of Hemingford threatened and then filed a lawsuit against David and Hannah for their outstanding debt; (2) at the time of the transfer, the Debtors were insolvent; (3) the transfer was made to a person with a special relationship to the Debtors, David's father Theodore; (4) after the transfer David continued to retain control and benefits from the stock; (5) this transfer, coupled with others made at the time, involved substantially all of David and Hannah's unencumbered assets; and (6) the transfer departed from the usual way of doing business.

David and Hannah stipulated that they were insolvent at all times relevant to this transfer, however, they presented evidence that disputed the remaining badges of fraud. They testified that they were in negotiations with the Bank of Hemingford about ways that they could reach a settlement on their debt throughout 1986.  They also testified that they were not aware that the Bank of Hemingford had either threatened or filed a lawsuit against them until after the shares had been sold. Although the transfer was made to David's father, Theodore, David and Theodore were the sole shareholders in

-5-

a closely-held company, making it very difficult to sell the shares to any other person. Theodore was given possession of the stock, and exercised the voting rights of the stock from that point forward. Although David and Hannah did transfer a majority of their unencumbered assets, it was less than twenty percent of their total assets. Additionally, the Bank of Hemingford made representations to David and Hannah that it had no interest in David's Maverick stock. Finally, David and Theodore testified that it was Theodore's idea that he purchase the stock. They testified that the sale came about after multiple discussions over several weeks. The price for the stock, $44.40, was set by determining the entire value of Maverick's assets and dividing that by the 10,000 shares in the company.

Even if a confluence of the badges of fraud were present, David and Theodore presented a "legitimate supervening purpose" for the sale—Theodore wanted control of the company because he had pledged significant assets as collateral for a Maverick loan. In the fall of 1986, Theodore was searching for a bank that could supply all of Maverick's lending needs. Prior to this time, Maverick had borrowed money from Southwest Bank in Omaha, and from Theodore, who took out a loan from a bank in Florida. Theodore, through his lawyer and friend, Marvin Schmid, was directed to the Omaha State Bank. Omaha State initially extended Maverick a $150,000 credit line. Theodore requested an increase in the credit line to $600,000 in October 1986, so that Maverick could consolidate its credit. In order to secure this credit line, Theodore pledged $780,000 of marketable securities. Theodore decided, that because he had made such a large personal financial commitment on Maverick's behalf, he needed control of Maverick. Theodore testified to this purpose at three separate times.

## 2.    The Sale of the Residence

David and Hannah sold their residence in Alliance, Nebraska, to Theodore for $157,700 in October 1986.   The Trustee alleges that the sale of the residence shares the same "badges of fraud" as the stock sale.   David and Hannah did make the transfer to a close relative, and remain in possession and control of the residence.   They, however, also presented evidence that they had the house appraised by a licensed appraiser before the sale to determine its fair market value.   Theodore paid the appraised value of $157,700 for the house.   Additionally, David and Hannah testified that they paid $650 a month in rent after the sale, the fair rental value for the home.

Furthermore, throughout their negotiations, the Bank of Hemingford had represented to David and Hannah that it had no interest in the residence as security. But, as early as March 1986, the bank suggested David and Hannah might want to sell their house to raise money.   David testified that he began discussing the sale of his house with Theodore in August or September of 1986.   His purpose in making the sale was to raise money for a settlement with the Bank of Hemingford.   David also testified that he made no attempt to hide the sale from the Bank of Hemingford, and in fact he testified that he recorded the sale knowing that the clerk who does the recording in Alliance was the daughter of their loan officer at the Bank of Hemingford.

The Trustee also contends the stock and house sales are fraudulent because David and Hannah placed the proceeds of the sales in exempt annuities.   David testified, however, that they had no knowledge that the annuities were exempt.   David and Hannah testified that they had not had a savings account in over forty years and had always used annuities as a saving tool.   David also testified that he chose those particular annuities because they had a small penalty for early withdrawal and the money could easily be withdrawn if they reached an agreement with the Bank of Hemingford.

### 3.     Stock and Vehicle Pledge to Omaha State Bank

Along with the lawsuit, the insolvency, the hurried nature of the transfer, and the transfer of substantially all encumbered assets as badges of fraud, the Trustee asserts the following badges of fraud were present in the stock pledge and the vehicle pledge: (1) David retained possession and control of Maverick's assets and reserved for himself the economic benefits of the pledged shares by paying himself a salary from Maverick funds and having Maverick pay for all the attorney's fees associated with this litigation, and retained control and possession of the vehicles; and (2) he did not receive equivalent value for the shares or the vehicles because he was not obligated to Omaha State Bank.

David disputes these contentions. With respect to the first contention, David presented evidence showing that he delivered the stock pledge to the bank and once the bankruptcy was filed, the voting rights were exercised by the Trustee. Additionally, David testified about the efforts he made on behalf of Maverick that warranted a salary. For example, he managed and continues to manage the day-to-day operations of Maverick, traveling 180 miles to the property at the beginning of each week and returning to Alliance on Fridays. David's efforts throughout the period of the bankruptcy also substantially increased the value of Maverick's assets, and garnered him state-wide conservation awards. His increased responsibilities coincided with the bankruptcy because David's decision to quit farming and to devote his time to Maverick precipitated the bankruptcy. As for the attorney fees, Eugene Zaloudek, the former president of the Omaha State Bank and loan officer for the Maverick loan, testified that he required Maverick to sign an agreement that it would pay any attorney fees relating to litigation over collateral for the loan.

David also presented evidence of a legitimate purpose for the transfer. Zaloudek testified that he thought it would be prudent to have David pledge his Maverick stock because David was president and chief operating officer of Maverick. He believed that

the pledge would create an incentive to produce income to pay off the loan. Theodore also testified that he wanted David to pledge the stock and other assets because he felt David needed to have some stake in the loans. Finally, David testified that he pledged the stock and the vehicles because of Theodore's request.

As a final note, both David and Hannah were asked at trial if they had any intent to hinder or delay their creditors. They both testified that they did not. Although we recognize that these are self-serving statements, it is the province of the jury to hear testimony, to judge the credibility of that testimony, and to make a determination about the truth of the statements.

Therefore, we find that the evidence was sufficient to support the jury's verdict.

### B. Jury Instructions

We review jury instructions for an abuse of discretion. See Martin v. Wal-Mart Stores, Inc., 183 F.3d 770, 773 (8th Cir. 1999). When a substantive challenge to a jury instruction is made, we must inquire "'whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.'" Horstmyer v. Black & Decker, Inc., 151 F.3d 765, 771 (8th Cir. 1998) (quoting Kansas City Power & Light Co. v. Ford Motor Credit Co., 995 F.2d 1422, 1430 (8th Cir. 1993)). Additionally, "'[t]he district court has discretion in the style and wording of jury instructions'" and a lack of perfect clarity will not undermine a jury instruction so long as the governing law is adequately and fairly set forth. Id. (citations omitted). Even if the district court were to err in giving an instruction, we would reverse only if the substantial rights of the parties were affected. See Martin, 183 F.3d at 773.

The Trustee first argues that the district court failed to instruct the jury that the burden of proof shifted to the defendants if he proved the presence of two or more

"badges of fraud." Additionally, the Trustee challenges the court's use of the word "presumption" rather than "burden of proof" because he argues "presumption" is not clear enough to a lay person. The Trustee also faults the district court's failure to refer to badges and indicia of fraud. Finally, the Trustee asserts that the jury was improperly instructed that the burden of proof was by a preponderance of the evidence instead of by significantly clear evidence.

Although the instruction does not use the Trustee's words of choice, we find it fairly and adequately sets forth the law. The instruction provides the jury with a list of ten "factors" of fraud. It then states:

> If the Trustee has proven by the greater weight of the evidence two or more "factors" with regard to a particular transfer, then the Trustee is entitled to a presumption that the transfer made by David and Hannah Armstrong was made with actual intent to hinder, delay or defraud a creditor. Except as stated in the following paragraph, this "factors" presumption means that you must assume that the Trustee has proven that David and Hannah Armstrong acted with actual intent to hinder, delay or defraud a creditor when making the challenged transfer.
>
> However, even if the Trustee has proven two or more "factors" with regard to a particular transfer, if a defendant also proves by the greater weight of the evidence that David and Hannah Armstrong had a legitimate and independent purpose for the challenged transfer, then you should not assume that David and Hannah acted with actual intent to hinder, delay or defraud a creditor when making the challenged transfer.

Appellant's App. at 215-16 (Jury Instruction No. 19). The Trustee's criticisms are misplaced. The district court's instruction adequately defined "presumption" to the jury. We find no error in the district court's substitution of the word "factors" for the overly legalistic terms "badges of fraud" or "indicia of fraud."

-10-

Moreover, we find that the preponderance of the evidence standard is correct. The Trustee contends that "significantly clear evidence" equates to a higher burden of proof than the preponderance standard on which the district court instructed. Although we did not say that "significantly clear evidence" was required to prove the bankrupt's legitimate purpose in <u>Armstrong III</u>, this court did make such a statement in <u>In re Sherman</u>, 67 F.3d 1348, 1354 (8th Cir. 1995). After reading <u>Sherman</u> and the cases that it cites, we have determined that when the court speaks of needing "significantly clear evidence" it means direct evidence rather than indirect evidence. See <u>id.</u>; <u>see also</u> <u>In re Acequia</u>, 34 F.3d at 805-06; <u>Max Sugarman Funeral Home, Inc. v. A.D.B. Investors</u>, 926 F.2d 1248, 1255 (1st Cir. 1991). The <u>Sugerman</u> case was the first in this line of cases to use the term "significantly clear evidence." The case that it cites to support this proposition never uses the words "significantly clear evidence," but rather speaks of the need for direct or affirmative evidence of a legitimate purpose. See <u>In re Cushman Bakery</u>, 526 F.2d 23, 32-33 (1st Cir. 1975). Therefore, we do not believe that the court intended to create a new level of proof, and the district court's instruction putting forth a preponderance of the evidence standard was correct.

## C. Evidentiary Issues

We review evidentiary rulings for an abuse of discretion. See <u>Dominium Management Serv., Inc. v. Nationwide Housing Group</u>, 195 F.3d 358, 367 (8th Cir. 1999). A district court has particularly broad discretion when weighing the probative value of the evidence against the "danger of unfair prejudice, confusion of the issues, or misleading the jury." <u>Porous Media Corp.</u>, 173 F.3d at 1117. Accordingly, we will not disturb a district court's evidentiary ruling absent a prejudicial abuse of that discretion. See <u>Dillon v. Nissan Motor Co.</u>, 986 F.2d 263, 270 (8th Cir. 1993).

The Trustee contends that the evidence regarding David and Hannah's payment history to the Bank of Hemingford was irrelevant and confused the jury. After carefully reviewing the record, we believe this evidence was relevant because it demonstrated

the relationship that David and Hannah had with the Bank of Hemingford at all times leading up to the bankruptcy and showed that they continued to make payments to the bank even after bankruptcy was filed. The evidence is also relevant to support their credibility regarding their statement that they had no intent to hinder the bank. Therefore, we find the district court did not abuse its discretion in admitting this evidence.

## III. CONCLUSION

Accordingly, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-12-